**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**EDNA TAJONERA, et al.**                               **CIVIL ACTION**

**VERSUS**                                              **NO. 13-0366**
                                                        **c/w 13-0550, 13-5137, 13-2496,**
                                                        **13-5508, 13-6022, 13-6099,**
                                                        **13-6413, and 14-374**

**BLACK ELK ENERGY OFFSHORE OPERATIONS,**               **SECTION: "G"(5)**
**L.L.C., et al.**

**ORDER**

    Before the Court is Defendant Grand Isle Shipyard, Inc's ("Grand Isle") Motion for Summary Judgment, wherein Grand Isle contends that Avelino Tajonera ("Tajonera") was a borrowed servant of Grand Isle at the time of his injury, such that Plaintiffs are barred from bringing tort claims against Grand Isle.[1]  Having considered the motion, the responses, the replies, the statements made at oral argument, the record, and the applicable law, the Court will deny the motion.

**I. Background**

*A.*    *Factual Background*

    This litigation arises out of an explosion that occurred on November 16, 2012 on the Black Elk Energy West Delta 32 Block Platform ("WD 32"), located in the Gulf of Mexico approximately 17 miles southeast of Grand Isle, Louisiana.  According to the Complaint, Tajonera, a welder, was injured in the explosion and later died from his injuries.[2]  Tajonera was hired by D&R Resources,

---

[1]  Rec. Doc. 394.

[2]  Rec. Doc. 1. at p. 1–2.

1

LLC ("D&R") in 2008.[3]  D&R provides workers for onshore and offshore work.[4]  D&R and Grand Isle entered into a Master Service Agreement ("MSA") on or about May 1, 2012, providing that D&R employees, including Tajonera, would perform work for Grand Isle at times.[5]  Grand Isle was a contractor of Black Elk Energy Offshore Operations, LLC ("BEEOO"), the owner of WD 32.[6]

**B.    *Procedural Background***

Grand Isle filed the pending motion on August 19, 2014.[7]  Plaintiffs filed a memorandum in opposition on September 9, 2014.[8] Also on September 9, 2014, Defendants BEEOO and Black Elk Energy, LLC (collectively, "Black Elk") filed a memorandum adopting by reference the arguments and evidence contained in Plaintiffs' opposition.[9] The Court heard oral argument regarding this motion on September 17, 2014 and granted Grand Isle leave to file additional evidence in support of its motion.[10] Plaintiffs filed a sur-reply memorandum in opposition on September 17, 2014.[11] With leave of the Court, Grand Isle filed a supplemental memorandum in support of its motion on September 18, 2014.[12]  Grand Isle filed a second supplemental memorandum in support  on

---

[3]  Rec. Doc. 394-4 at p. 1.

[4]  *Id.*

[5]  *Id.* at p. 2.

[6]  *Id.*

[7]  Rec. Doc. 394.

[8]  Rec. Doc. 425.

[9]  Rec. Doc. 432.

[10]  Rec. Doc. 466.

[11]  Rec. Doc. 470.

[12]  Rec. Doc. 473.

September 19, 2014,[13] and Plaintiffs submitted a second sur-reply on September 22, 2014.[14] Grand Isle submitted a third supplemental memorandum on October 2, 2014.[15] Plaintiffs filed a third sur-reply memorandum on October 7, 2014.[16]

## II. Parties' Arguments

### A.   Grand Isle's Arguments in Support

Grand Isle contends that at all material times, Tajonera was Grand Isle's borrowed employee under the nine factor test set forth by the Fifth Circuit in *Ruiz v. Shell Oil Co.*, and therefore, Grand Isle is immune from tort liability under the Longshore and Harbor Workers' Compensation Act ("LHWCA").[17] Grand Isle first avers that Tajonera  took orders from Grand Isle supervisors including Curtis Dantin.[18] Grand Isle concedes that the MSA between Grand Isle and D&R states:

> It is expressly understood that Contractor is an independent Contractor and that neither Contractor nor Contractor's principales [sic], partners, employees, or subcontractors, or servants, agents, or employees are servants, agents, or employees of Grand Isle. Grand Isle shall designate the services it desires to be performed and the ultimate results to be obtained, but shall leave to Contractor the methods and details of performance, Grand Isle being interested only in the results obtained, and having no control over the manner and method of performance.[19]

Grand Isle avers, however, that D&R hands were "controlled by GIS supervisors who gave

---

[13]  Rec. Doc. 476.

[14]  Rec. Doc. 480.

[15]  Rec. Doc. 488.

[16]  Rec. Doc. 490.

[17]  *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312 (5th Cir. 1969).

[18]  Rec. Doc. 394-2 at p. 7 (citing Rec. Doc. 394-10 at pp. 88-89).

[19]  *Id.* (citing Rec. Doc. 395-5 at p. 1).

instructions and ran safety meetings" on a daily basis.[20]

Grand Isle next contends "[Grand Isle] had a Business Alliance Agreement with Black Elk Energy Offshore Operations, LLC that governed the work being performed at the time of the incident."[21] By contrast, Grand Isle argues, D&R did not have any contractual relationships with Black Elk that "contributed" to D&R employees' work at WD 32.[22] Grand Isle further argues that although the MSA provides that D&R's employees are independent contractors, the Fifth Circuit has held that such contract provisions do not automatically negate borrowed employee statutes.[23] Grand Isle contends that the course of conduct between Tajonera and Grand Isle – namely, that Tajonera allegedly received his daily duty assignments from Grand Isle – altered the Master Service Agreement as "D&R clearly understood its employees would work as directed by [Grand Isle]."[24]

Next, Grand Isle argues that "every indication" suggests that Tajonera acquiesced to working with Grand Isle from November 2008 through November 2012 because he continued to return to Grand Isle after every vacation.[25]  Grand Isle additionally contends that because D&R allegedly maintains minimal contact with its employees – limited apparently to coordinating who would go out on a job – D&R "terminates" its relationship with the employee once the borrowing occurs.[26]

Grand Isle additionally avers that Tajonera received his tools and protective equipment from

---

[20] *Id.*

[21] *Id.* (citing Rec. Doc. 394-8).

[22] *Id.* at pp. 7–8.

[23] *Id.* at p. 8 (citing *Brown*, 984 at 677-78; *Melancon*, 834 F.2d at 1245).

[24] *Id.*

[25] *Id.* at p. 9.

[26] *Id.*

Grand Isle.[27] Grand Isle also argues that length of employment with the borrowing employer is "considerable" when the employee has worked for the borrowing employer for two or more years prior to the alleged incident.[28] Tajonera worked for Grand Isle for a total of four years, according to Grand Isle, which favors a finding of borrowed employee status.[29] Grand Isle contends that it had the right to terminate its relationship with its borrowed employees. Specifically, Grand Isle avers that supervisor Curtis Dantin had the authority to remove any D&R hand from a Grand Isle job.[30] Finally, Grand Isle avers that "[r]egardless of the mechanism used to disburse funds, the ultimate question is which entity furnished the funds to pay the employee."[31] In this case, Grand Isle argues, "D&R employees were guaranteed twelve hours per day, overtime was authorized by the [Grand Isle] supervisor."[32] D&R then billed Grand Isle based on time ticket, and Grand Isle paid D&R for the employees' time.[33] According to Grand Isle, there is no evidence that D&R played any part in setting Tajonera's schedule or controlled the number of hours that he worked.[34]

## B.    *Plaintiffs' Memorandum in Opposition*

Plaintiffs contend that six *Ruiz* factors – control, meeting of the minds, employee's acquiescence to the work situation, employer's termination of relationship with the employee, right

---

[27]  *Id.* at p. 10 (citing Rec. Doc. 394-6 at pp. 192-3; 218-19).

[28]  *Id.* (citing *Alleman v. OMI Energy Services Corp.*, 512 F.Supp.2d 445, 457-58 (E.D. La. 2007)).

[29]  *Id.*

[30]  *Id.* at p. 11 (citing Rec. Doc. 394-7 at p. 294).

[31]  *Id.*  (citing *Melancon*, 834 F.2d at 1246).

[32]  *Id.*

[33]  *Id.*

[34]  *Id.*

to discharge the employee, and obligation to pay the employee – favor a finding that Tajonera was not a borrowed employee of Grand Isle.[35]  Plaintiffs concede that the  length of employment factor is neutral, and that the remaining two factors – who provided tools and whose work was being performed – favor borrowed servant status.[36]

With respect to the factor of "control," Plaintiffs argue that D&R, not Grand Isle, controlled Tajonera.  Plaintiffs first dispute Grand Isle's argument that the parties' actions in carrying out the MSA impliedly modified, altered, or waived the express contractual provisions. Rather, according to Plaintiffs, the MSA provisions concerning control are integral to the contract and have been in place since 2006.[37] Plaintiffs point to an affidavit by Grand Isle Vice President Mark Pregeant to the U.S. Department of State in 2006, in which Pregeant allegedly stated that pursuant to the MSA, "In no way will Grand Isle Shipyards, Inc. act as the employer of or exercise any control over D&R Resources' employees. They will remain employees of D&R Resources, as specified in the contract. While performing their day-to-day work under the contract, they will be reporting to D&R Resources' supervisors, not Grand Isle Shipyard, Inc.'s employees."[38]

Plaintiffs next argue that D&R relied on its own Construction Supervisors to manage and control D&R employees. According to Plaintiffs, Randolf Malagapo testified as the D&R corporate representative that if a D&R Construction Supervisor was not present offshore, a D&R crew could be overseen by a D&R foreman, who performed the same tasks as a Construction Supervisor.[39] On

---

[35]  Rec. Doc. 425 at p. 5.

[36]  *Id.*

[37]  *Id.* at p. 7.

[38]  *Id.* at pp. 7–8 (citing Rec. Doc. 425-17).

[39]  *Id.* at p. 8 (citing Rec. Doc. 425-5 at 171:6–18).

6

the day at issue, Plaintiffs contend, Antonio Tamayo was the D&R Foreman on the platform, and Tamayo was authorized to direct the work of D&R employees once they received a "go signal" from their superiors.[40] Plaintiffs additionally contend that D&R Construction Supervisors "customarily and regularly directed the work of at least two other employees, but sometimes up to ten employees," and were responsible for "directing the work of employees, appraising employees' productivity and efficiency, handling employee complaints and grievances, disciplining employees, planning work, determining work techniques, apportioning work among employees, determining the type of equipment/tools to be used, and safety and security."[41]

According to Plaintiffs, on the morning of November 16, 2012, the D&R and GIS employees gathered for a safety meeting.[42] As part of the meeting, a "WP/SEA" form, which allegedly details the manner and methods of the work to be performed that day, was completed by Tamayo.[43] Plaintiffs also point to deposition testimony of Grand Isle employee Curtis Dantin and the corporate representative of Grand Isle, Mark Pregeant, that Dantin was not supervising the LACT work on November 16, 2012 and that he left Tamayo in control.[44]

With respect to the third *Ruiz* factor – whether there was an agreement or meeting of the minds between the original and borrowing employer – Plaintiffs contend that the MSA contains the parties' agreement that D&R controls D&R employees.[45] Plaintiffs further point to Pregeant's

---

[40] *Id.* (citing Malagapo deposition at 172:20–5).

[41] *Id.* (citing Rec. Doc. 425-6 at ¶ 11).

[42] *Id.* at p. 9.

[43] *Id.* (citing Rec. Doc. 425-7 at 204:25–206:1; Rec. Doc. 425-8).

[44] *Id.* at pp. 10–11 (citing Rec. Doc. 425-4, 605:21–606:12).

[45] *Id.* at p. 12.

declaration to the Department of Homeland Security, which they aver demonstrates that the parties intended D&R to maintain control over its employees.[46]   Plaintiff reavers that both Dantin and Pregeant testified that D&R foremen could instruct D&R employees.[47]

Turning to the fifth *Ruiz* factor, whether D&R terminated its relationship with Tajonera, Plaintiffs argue that D&R was supervising Tajonera when he was injured, that a D&R foreman was in charge of the D&R employees at the LACT unit, that the D&R foreman filled out the daily WP/SEA worksheet which outlined how the work was to be performed that day, and that D&R supervisors retained administrative control.[48]   Plaintiffs further contend that Malagapo "confirmed that D&R never relinquished its authority to assign its workers and remove or transfer them from worksite to worksite."[49] According to Plaintiffs, D&R employee Danilo Dayao would post work assignments on a bulletin board in the bunkhouse.[50] If a worker was unable to work due to illness, he would notify Malagapo or another D&R employee.[51] Tajonera's pay and pay raises were controlled by D&R.[52] D&R handled grievances and discipline, and provided workers' compensation benefits.[53]   Plaintiffs point to Malagapo's deposition, in which he testified that only D&R could

---

[46] *Id*. (citing Rec. Doc. 425-17).

[47] *Id.* at p. 13 (citing Rec. Doc. 425-4, 275:21–276:13; Rec. Doc. 425-7, 90:14-24).

[48] *Id.* at p. 15.

[49] *Id.* at p. 16 (citing Rec. Doc. 425-5, 188:21–189:3).

[50] *Id.* at pp. 16–17.

[51] *Id.* at p. 17.

[52] *Id.*

[53] *Id.*

terminate and remove its employees.[54] Finally, Plaintiffs contend that "while Tajonera was on WD 32, D&R retained the right to pull him from the rig and reassign him."[55]

Turning to who had the right to discharge Tajonera, *Ruiz* factor eight, Plaintiffs aver that although Grand Isle could complain to D&R about a worker, it was ultimately D&R's decision whether to remove that worker.[56] With respect to the final *Ruiz* factor, who had the obligation to pay Tajonera, Plaintiffs contend that "the question of whether [Grand Isle] furnished the funds that paid Tajonera is unsettled."[57] Contrary to Grand Isle's argument that Tajonera's earnings were determined by the hours he worked, Plaintiffs allege Tajonera was actually paid by D&R pursuant to a contract.[58] Plaintiffs point to Malagapo's deposition testimony that payments to Tajonera were based on his contract, and that he would be paid even if he did not work.[59]

## C.      *Black Elk's Memorandum in Opposition*

Black Elk contends that genuine issues of material fact exist as to whether Tajonera was the borrowed employee of Grand Isle on November 16, 2012.[60] Black Elk adopts by reference the arguments and evidence contained in Plaintiffs' Opposition to Grand Isle's Motion for Summary Judgment,[61] except as to any argument or representation regarding Black Elk's alleged liability for

---

[54] *Id.* (citing Rec. Doc. 425-5 at 184:77–185:3).

[55] *Id.*

[56] *Id.* at pp. 19-20.

[57] *Id.* at p. 20.

[58] *Id.*

[59] *Id.* (citing Rec. Doc. 425-5, 116:23-117:5).

[60] Rec. Doc. 432.

[61] Rec. Doc. 425.

the accident at issue.

**D.      *Grand Isle's Supplemental Memorandum in Support***

In support of its Motion for Summary Judgment, Grand Isle reavers that Grand Isle, not D&R, controlled Tajonera's work assignments on the platform.[62] Grand Isle points to Antonio Tamayo's testimony, in which he states that Curtis Dantin was "our supervisor."[63]  According to Grand Isle, while Tamayo may have had some supervisory role on other jobs, on WD 32 all D&R hands were equal and there was no D&R supervisor.[64] Grand Isle further avers that Curtis Dantin gave all D&R employees their job tasks on a daily basis, so "even if Tamayo passes along instructions in some sort of a quasi supervisory capacity, so long as those instructions were received from [Grand Isle], it is [Grand Isle] who is controlling the work."[65] Grand Isle next contends that the affidavit of Mark Pregeant is "irrelevant and outdated" because it was signed in 2006 and refers only to three jobs other than the WD 32 job.[66]

The Malagapo affidavit, according to Grand Isle, is inapplicable because it was given in another matter regarding activities of D&R construction supervisors, who were not involved in the WD 32 job.[67] Grand Isle next contends that Tajonera acquiesced to his work with Grand Isle because (1) Tajonera worked exclusively on Grand Isle jobs from November 2008 through November 2012 and (2) an employment period of only a few weeks is sufficient to support a finding of borrowed

---

[62] Rec. Doc. 473 at p. 3.

[63] *Id.* at p. 4 (citing Rec. Doc. 473-5, Tamayo deposition, at pp. 38-39).

[64] *Id.*

[65] *Id.* at p. 5.

[66] *Id.* (citing Rec. Doc. 425-5 at ¶¶ 4-5).

[67] *Id.*

servant status in the absence of any complaints regarding the work situation.[68]

With respect to whether D&R terminated its relationship with Tajonera, Grand Isle contends that D&R was acting essentially as a "placement agency" with nominal contact with its employees once they were on the job.[69] The day-to-day responsibility for supervising Tajonera, according to Grand Isle, remained solely with Grand Isle.[70] Grand Isle additionally argues that "[a]ll [Grand Isle] and D&R employees signed the WPSEA [sic] and, thus[,] it is not a D&R document as plaintiff would suggest."[71]

Grand Isle next argues that Tajonera's employment was over a considerable period of time because "where a plaintiff is employed by a labor type service business and is expected to move from job to job, the length of time on a "new" job can be substantially shorted, to well less than one month."[72]  Grand Isle additionally reavers that it had the right to terminate Tajonera's employment with Grand Isle. Finally, Grand Isle contends that there is no dispute that D&R billed Grand Isle based on time tickets and Grand Isle paid D&R for the employees' time.[73]

### E.    *Plaintiffs' Sur-Reply in Opposition*

In response to Grand Isle's supplemental memorandum in support of its motion, Plaintiffs

---

[68] *Id.* at p. 7 (citing *Zuniga v. Transocean Offshore Deep Water Drilling*, 2013 U.S. Dist. LEXIS 160208, *9 (E.D. La. November 8, 2013).

[69] *Id.* at p. 8.

[70] *Id.*

[71] *Id.*

[72] *Id.* at p. 9.

[73] *Id.*

filed a sur-reply in further opposition.[74] With respect to Grand Isle's argument that Mark Pregeant's affidavit is "irrelevant and outdated," Plaintiffs argue that Pregeant testified that the relationship of the parties did not change between the 2006 and 2012 agreements.[75]  Plaintiffs also contend that they attempted to ask Pregeant about the affidavit, but were "stonewalled at every turn" by Grand Isle's counsel.[76] According to Plaintiffs, discovery from other cases, as well as declarations and affidavits filed in other cases, are  relevant and admissible when it relates to issues in the present case.[77]

Plaintiffs also contend that Grand Isle impermissibly offers new evidence – the deposition testimony of Jovito Lara Canencio,[78] Nick Pasno DeGuzman,[79] and Paulino Hermosillia Obenieta[80] – for the first time in its supplemental memorandum. Plaintiffs offer no authority to support their argument. Plaintiffs state that "[w]hile Plaintiff objects to consideration of evidence which was not filed with the motion for summary judgment, the testimony simply illustrates the existence of disputed facts."[81]

---

[74] Rec. Doc. 470. Plaintiffs filed a "Sur-Reply Memorandum in Opposition to Black Elk's Motion for Summary Judgment." Since Black Elk did not file the pending Motion for Summary Judgment, the Court understands this to refer to Grand Isle's Motion for Summary Judgment.

[75] *Id.* at p. 3.

[76] *Id.* at p. 4 (citing Rec. Doc. 470-1, 622:21 – 623:21).

[77] *Id.* at p. 2 (citing *Harvey v. Toyota Material Handling, USA*, No. 05-0561, 2007 WL 1115235 at *5 (W.D. La. April 13, 2007)).

[78] Rec. Doc. 473-1.

[79] Rec. Doc. 473-2.

[80] Rec. Doc. 473-3.

[81] Rec. Doc. 470 at p. 2. Plaintiffs do not address this argument further in their sur-reply, although they do address it in their second sur-reply (Rec. Doc. 480).

### F.     Grand Isle's Second Supplemental Memorandum in Support

Grand Isle reavers that "[t]here is no evidence that Tajonera received any instruction that did not come from Curtis Danton," and that "[t]o the extent that any instruction may have been conveyed to Tajonera through Tamayo, that instruction originated with Dantin.[82] Grand Isle additionally contends that Tajonera worked for Grand Isle for four years and on the WD 32 platform for one week. "Plainly, his work with [Grand Isle] was over a considerable length of time and there is no evidence that he did not acquiesce to working on the Black Elk platform."[83]

### G.     Plaintiffs' Second Sur-Reply Memorandum in Opposition

Plaintiffs reaver that, in their view, six *Ruiz* factors affirmatively show that Tajonera was not a borrowed employee.[84] Plaintiffs reaver that the MSA between Grand Isle and D&R designated D&R as an independent contractor, and that "the parties conducted themselves in the manner called for in the agreement."[85] Plaintiffs again point to D&R Corporate Representative Malagapo's deposition testimony that D&R "maintained the power to assign its employees and to pull its employees and move them to other rigs at their discretion."[86]

In response to Grand Isle's argument that Canencia, DeGuzman, and Obenieta testified that Dantin gave instructions to the D&R employees at WD 32, Plaintiffs contend that "[t]he cited testimony talks about the general experiences of D&R employees between 2007 and 2012 and

---

[82]  Rec. Doc. 476 at p. 7 (citing Rec. Doc. 476-2, Grand Isle's Corporate deposition, at pp. 508-09).

[83]  *Id.* at p. 8.

[84]  Rec. Doc. 480 at p. 2.

[85]  *Id.* at pp. 2–3.

[86]  *Id.* at pp. 4–5.

doesn't reference WD 32."[87] According to Plaintiffs, the testimony and declaration of Malagapo, the Master Service Agreement, and Mark Pregeant's affidavit directly contradict these assertions.[88] Furthermore, "DeGuzman, Obenieta, Canencia, and Dominguez were not at the LACT unit, where Foreman Tamayo controlled the work of Tajonera, Corporal, and Ilagan."[89] Plaintiffs argue that any testimony of workers who were not at the LACT unit on WD 32 is irrelevant. Additionally, Plaintiffs contend that the testimony of Dantin, Pregeant, and Malagapo, as well as the MSA, the WP/SEA, and other documents, show that Tamayo was in charge.[90] With respect to whether Tajonera acquiesced to working on WD 32, Plaintiffs submit that "[i]n the absence of any evidence showing acquiescence, whether one week is sufficient to acquiesce is a disputed issue of fact."[91]

## H.    Grand Isle's Third Supplemental Memorandum in Support

Grand Isle argues that on September 17, 2014, the Parties obtained the deposition testimony of Jade Dianne N. Tajonera, the twenty-one year old daughter of Avelino Tajonera.[92] According to Grand Isle:

> Ms. Tajonera testified that she talked to her father by telephone on a daily basis. Ms. Tajonera testified further that during the eight year period he worked in the United States he only work [sic] for D&R and [Grand Isle]. According to Ms. Tajonera, [Grand Isle] employees were the ones telling her father what to do. Tajonera lived in the [Grand Isle] bunkhouse, and did not complain about his job and he and other

---

[87] *Id.* at p. 7.

[88] *Id.*

[89] *Id.*

[90] *Id.* at p. 8.

[91] *Id.* at p. 11.

[92] Rec. Doc. 486-2 at p. 1.

workers did not complain because they thought [Grand Isle] might fire them [sic].[93] According to Grand Isle, this testimony supports Grand Isle's position that Tajonera was a borrowed employee at the time of the incident.[94]

### I.     *Plaintiffs' Third Sur-Reply in Opposition*

Plaintiffs contend that the statements of Avelino Tajonera, as told to his daughter, are inadmissible hearsay because they are offered to assert the truth of the matter therein, that Grand Isle controlled Tajonera's work.[95]   According to Plaintiffs, "[t]his testimony is inadmissible hearsay, would not be admissible at trial, and may not be considered as summary judgment evidence."[96]

### III. Standard for a Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[97] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[98] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[99] If the record, as

---

[93]   *Id*. at p. 2 (citing Rec. Doc. 486-3).

[94]   *Id.*

[95]   Rec. Doc. 490 at p. 2.

[96]   *Id.*

[97]   Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[98]   *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[99]   *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

a whole, could not lead a rational trier of fact to find for the non-moving party, then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law."[100] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[101]

The party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[102] Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[103]  To withstand a motion for summary judgment, a plaintiff must show that there is a genuine issue for trial by presenting evidence of specific facts.[104]  The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied  merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[105] Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[106]

---

[100]  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

[101]  *See, e.g.*, *Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[102]  *Celotex*, 477 U.S. at 323.

[103]  *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.1994), cert. denied, 513 U.S. 871 (1994).

[104]  *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012), citing *Anderson*, 477 U.S. 242 at 248-49.

[105]  *Little*, 37 F.3d at 1075.

[106]  *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987); Fed.R .Civ.P. 56(c)(2).

## IV. Law and Analysis

### A.   *Evidentiary Issues*

#### 1.   Jade Tajonera's Deposition Testimony

A district court may only consider admissible evidence in ruling on a motion for summary judgment.[107]  This Court therefore may properly consider Jade Tajonera's deposition insofar as it is not based on hearsay or other information excludable from evidence at trial.[108]  Here, Grand Isle "submits that this testimony from Mr. Tajonera's daughter supports [Grand Isle]'s position that Tajonera was its borrowed employee at the time of the incident."[109] Specifically, Grand Isle asserts that the testimony "supports the contention that [Grand Isle] had the right to control Tajonera's work by giving him his daily instructions and that Tajonera's work for [Grand Isle] was over a long period of time and that he acquiesced to working as [Grand Isle]'s borrowed employee."[110] By its own account, Grand Isle offers the statements to prove the truth of the matter asserted: that Grand Isle controlled Tajonera and that Tajonera "acquiesced to working as [Grand Isle]'s borrowed employee."[111] The Court finds that this evidence is hearsay, and as such, it is not appropriate for consideration in ruling on this summary judgment motion.[112]

#### 2.   Evidence Given in a Prior Matter

Grand Isle contends that the Pregeant affidavit is impermissible evidence to be considered

---

[107] *Coleman v. Jason Pharm.*, 540 F. App'x 302, 306 (5th Cir. 2013) (citing Fed. R. Civ. Proc. 56(c)(2)).

[108] *See Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987).

[109] Rec. Doc. 486-2 at p. 2.

[110] *Id.*

[111] *Id.*

[112] *See* Fed. R. Civ. P 56(e).

on this motion for summary judgment because it was signed in 2006 and referred to three jobs other than the WD 32 job.[113] Grand Isle does not cite any authority in support of this argument. Plaintiffs argue that  discovery from other cases, as well as declarations and affidavits filed in other cases, are relevant and admissible when it relates to issues in the present case.[114] Plaintiffs cite only *Harvey v. Toyota Material Handling, USA* in support of their argument. In that case, the Western District of Louisiana determined a motion for summary judgment based in part on 25 Accident Search Detail reports from an online Occupational Safety & Health Administration database of workplace accidents that had been complied by the plaintiff's expert.[115]

Federal Rule of Civil Procedure 56(c) states in pertinent part that:

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]

(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.[116]

Given that neither party properly briefs this issue, and given that the affidavit appears to be sufficient under Rule 56(c), the Court finds that it is not impermissible evidence to be considered on this motion for summary judgment.

---

[113]  Rec. Doc. 473 at p. 5.

[114]  Rec. Doc. 470 at p. 2.

[115]  *Harvey v. Toyota Material Handling, USA, Inc.*, No. 05-0561, 2007 WL 1115235 (W.D. La. Apr. 13, 2007).

[116]   Fed. R. Civ. P. 56(c)(1)(A), 56(c)(4).

### 3.     Evidence provided for the first time in a supplemental memorandum

Plaintiffs also contend that Grand Isle impermissibly offers new evidence – the deposition testimony of Jovito Lara Canencio,[117] Nick Pasno DeGuzman,[118] and Paulino Hermosillia Obenieta[119] – for the first time in its supplemental memorandum. Plaintiffs offer no authority to support their argument, and instead state that "[w]hile Plaintiff objects to consideration of evidence which was not filed with the motion for summary judgment, the testimony simply illustrates the existence of disputed facts."[120] Given that Plaintiffs do not cite any authority to support this argument, and since Plaintiffs argue that the three depositions are "irrelevant," [121] the Court  finds that the depositions are not impermissible evidence to be considered on this motion for summary judgment.

### B .    *Borrowed Employee Doctrine*

The Parties appear to agree that Tajonera was injured on the Outer Continental Shelf. Section 1333(b) of the Outer Continental Shelf Lands Act ("OCSLA") incorporates and extends the benefits of the Longshore and Harbor Workers' Compensation Act ("LHWCA") to employees injured on fixed platforms on the Outer Continental Shelf.[27] Under the LHWCA, employees are prevented from bringing tort actions against their employers and their recovery is limited to certain statutorily prescribed compensation benefits.[122]  Because a borrowing employer enjoys the same protection as a nominal employer, a "borrowed employee" (also referred to as "borrowed servant") is also barred

---

[117]  Rec. Doc. 473-1.

[118]  Rec. Doc. 473-2.

[119]  Rec. Doc. 473-3.

[120]  Rec. Doc. 470 at p. 2. Plaintiffs do not address this argument further in their sur-reply, although they do address it in their second sur-reply (Rec. Doc. 480).

[121]  Rec. Doc. 480 at p. 7.

[122]  *See* 33 U.S.C. §§ 904(a), 905(a).

from suing the borrowing employer for anything more than workers' compensation benefits.[123] Thus, if Tajonera is found to be a "borrowed employee" of Grand Isle, then Plaintiffs will be barred from suing Grand Isle in tort.

Although the Parties dispute whether Plaintiff was a borrowed employee at the time of his injury, they agree that whether an employee is a borrowed employee constitutes an issue of law for the Court to decide by applying the nine factor test set forth by the United States Court of Appeals for the Fifth Circuit in *Ruiz v. Shell Oil Co.*[124] However, factual disputes concerning each factor should be submitted to the fact-finder prior to the Court making its ruling on whether the employee was a borrowed employee at the time of his alleged injury.[125]  In determining whether Tajonera was the borrowed employee of Grand Isle, the Court must consider each of the following factors:

1. Who has control over the employee and the work he is performing, beyond mere suggestions of details or cooperation?

2. Whose work is being performed?

3. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

4. Did the employee acquiesce in the new work situation?

5. Did the original employer terminate his relationship with the employee?

6. Who furnished tools and place for performance?

7. Was the new employment over a considerable length of time?

---

[123]   *Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1243 (5th Cir.1988).

[124]   *Ruiz*, 413 F.2d 310, 310 (5th Cir.1 969).

[125]   *See Gaudet v. Exxon Corp.*, 562 F.2d 351, 358 (5th Cir. 1977); *see also Barrios v. Freeport–McMoran Resource Partners, LP*, Nos. 93–0092, 93–0425, 1994 WL 90456 (E.D.La. Mar. 11, 1994) (Livaudais, J.).

8. Who has the right to discharge the employee?

9. Who had the obligation to pay the employee?[126]

No one factor or combination of factors is determinative.[127]   However, the Fifth Circuit has recognized the importance of the first and third factors in the resolution of the borrowed employee question; namely, the issues of control and consent.[128] Grand Isle argues that all nine *Ruiz* factors, including control and consent, weigh in favor of a finding that Tajonera was a borrowed employee.[129] Plaintiffs contend that disputed issues of material fact exist as to six *Ruiz* factors.[130] The Court considers each *Ruiz* factor in turn.

### 1.      Who Had Control of the Employee?

In evaluating whether the borrowing employer, Grand Isle, controlled and directed Tajonera's work, "a careful distinction must be made between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking."[131] In this case, there are material facts in dispute as to whether Grand Isle or D&R employees supervised Tajonera and assigned him work. Grand Isle argues that Curtis Dantin, a Grand Isle supervisor, gave the D&R employees instructions and split up the crew.[132] Conceding

---

[126]  *See e.g.  Lemaire v. Danos & Curole Marine Contractors*, 266 F.3d 1059 (5th Cir. 2001); *Brown v. Union Oil Co.*, 984 F.2d 674, 676 (5th Cir. 1993).

[127]   *W. v. Kerr-McGee Corp.*, 765 F.2d 526 (5th Cir. 1985).

[128]   *See Melancon,* 834 F.2d at 1245; *Capps,* 784 F.2d at 617; *Ruiz,* 413 F.2d at 312–13.

[129]  Rec. Doc. 394-2 at p. 12.

[130]  Rec. Doc. 425 at p. 5. Plaintiffs state that the length of employment factor is neutral, and the factors related to  who provided tools and whose work was being performed favor a finding of borrowed servant status. *Id.*

[131]  *Ruiz*, 413 F.2d at 313.

[132]  Rec. Doc. 394-2 at p. 7.

that the MSA expressly states that D&R employees are not servants, agents, or employees of Grand Isle, Grand Isle argues that "the reality of the worksite and the parties' actions in carrying out a contract" impliedly modified, altered, or waived express provisions of the MSA because Grand Isle employees allegedly gave instructions and ran safety meetings.[133] Plaintiffs contend that the MSA explicitly provides that Tajonera was not a borrowed servant of Grand Isle, and that D&R foremen supervised Tajonera.[134] Plaintiffs point to D&R's corporate deposition, wherein Randolf Malagapo testified that if a D&R Construction Supervisor was not present offshore, a D&R crew could be overseen by a D&R Foremen, and in this case, the D&R Foreman on the platform was Antonio Tamayo.[135] Plaintiffs further argue that Dantin left Tamayo in charge on the day of the explosion.[136]

Which party had general control over Tajonera is an undetermined factual issue necessary in the Court's determination of this factor. Accordingly, the factual determination of who controlled Tajonera's work should be decided by the fact-finder unless the other factors overwhelmingly support Tajonera's borrowed employee status.

### 2.     Whose Work Was Being Performed?

The Parties appear to agree that Tajonera was performing work for Grand Isle.[137] Plaintiffs concede that the D&R employees' work was being performed to upgrade systems on the Black Elk platform pursuant to a contract between Black Elk and Grand Isle, and that this work "was not

---

[133] *Id.*

[134] Rec. Doc. 425 at pp. 7-8.

[135] *Id.* at p. 8.

[136] *Id.* at p. 10 (citing Dantin deposition, 90:14-24).

[137] Rec. Doc. 394-2 at p. 7; Rec. Doc. 425 at p. 12.

D&R's work."[138] Since there is no dispute that Tajonera was performing Grand Isle's work, this factor favors a finding of borrowed servant status.

### 3.   Was There An Agreement or Understanding Between Grand Isle and D&R?

The Parties seem to agree that D&R and Grand Isle entered into a Master Service Contract that provides in pertinent part:

> It is expressly understood that Contractor is an independent Contractor and that neither Contractor nor Contractor's principales [sic], partners, employees, or subcontractors, or servants, agents, or employees are servants, agents, or employees of Grand Isle. Grand Isle shall designate the services it desires to be performed and the ultimate results to be obtained, but shall leave to Contractor the methods and details of performance, Grand Isle being interested only in the results obtained, and having no control over the manner and method of performance.[139]

Based on this provision, it would seem that D&R maintained control over Tajonera and that Tajonera is not a borrowed employee of Grand Isle. Grand Isle argues, however, that the parties' conduct modified their contractual agreement pursuant to the MSA.[140] Plaintiffs contend that  the MSA contains the parties' agreement that D&R would control D&R employees, and that the conduct of the parties clearly demonstrates that D&R and Grand Isle behaved in accordance with the contract.[141] Plaintiffs further point to Mark Pregeant's declaration to the Department of Homeland Security, which allegedly demonstrates that the parties intended D&R to maintain control over its employees.[142]

---

[138]  Rec. Doc. 425 at p. 12.

[139]  *Id.* (citing Rec. Doc. 395-5 at p. 1).

[140]   Rec. Doc. 394-2 at p. 8.

[141]  Rec. Doc. 425 at pp. 12-13.

[142]  *Id*. (citing Rec. Doc. 425-17).

Notwithstanding the express language of the MSA, courts have found contract provisions similar to the one at issue here do not prohibit a finding of borrowed servant status where the workplace realities are otherwise. Indeed, the Fifth Circuit has held the terms of the contract between the borrowing employer and payroll employer do not ordinarily provide a sufficient basis to deny summary judgment when the remaining *Ruiz* factors point toward borrowed servant status.[143] For instance, in *Brown v. Union Oil Co. of California*, the Fifth Circuit faced similar provisions in a contract between lending and borrowing employers that purported to prohibit the plaintiff's borrowed employee status.[144] The Court found that such contract provisions do not automatically prevent borrowed employee status from arising because the parties' actions in carrying out the contract can impliedly modify or waive the express provision.[145] "Whether the parties had an understanding that modified the contract may raise disputed factual issues."[146] The Court held that conflicting evidence regarding whether the parties impliedly modified the contract raised a factual dispute that should be determined by a fact-finder.[147]

Here, as in *Brown*, there is conflicting evidence regarding whether the parties' conduct modified the contract provision purporting to prohibit borrowed employee status. Grand Isle contends that Tajonera received his daily duty assignments from Grand Isle employees, and that this course of conduct impliedly modified the MSA.[148] Plaintiffs, on the other hand, assert that the

---

[143] *Alexander v. Chevron, U.S.A.*, 806 F.2d 526, 529 (5th Cir. 1986), citing *Gaudet v. Exxon Corp.*, 562 F.2d 351, 358 (5th Cir. 1977).

[144] *Brown v. Union Oil Co. of California*, 984 F.2d 674, 677 (5th Cir. 1993).

[145] *Id*. at 677-78 (citing *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1245 *amended on reh'g in part sub nom. Melancon v. Amoco Prods. Co.*, 841 F.2d 572 (5th Cir. 1988).

[146] *Id.* (citations omitted).

[147] *Brown*, 984 F.2d at 678.

[148] Rec. Doc. 394-2 at p. 8.

parties' actions in carrying out the contract did not alter the MSA.[149] As in *Brown*, this raises a factual dispute that should be determined by a fact-finder.

### 4.    Did the Employee Acquiesce in the New Work Situation?

The issue to be resolved under this factor is whether Tajonera had an opportunity to observe the conditions under which he was working and whether, after such an opportunity he chose to continue working.[150] The Fifth Circuit has found borrowed servant status where the plaintiff worked for only one day.  In *Capps v. N.L. Baroid-NL Indus., Inc*, a case upon which Grand Isle relies, a roustabout was injured on the first day of a new assignment and had been sent to a different location and/or company on each day of his employment with Davis. The Fifth Circuit found that "when he went to work for Davis, he acquiesced to the fact that Davis would constantly send him to new work situations."[151] In *Fontenot v. Mobil Oil Exploration & Producing Southeast, Inc.*, the plaintiff had been employed by Thibeaux & Son Construction, Inc. for one year, but had been injured after only two days of work on a Mobile Oil platform.[152] The Fifth Circuit found that he had acquiesced to his employment situation because  Thibeaux regularly sent him to temporary work places, and because "Fontenot had attended at least two safety meetings by his third day of work at the platform and had at no time objected to Mobile's authority over him. By failing to complain, plaintiff acquiesced to his new work environment."[153]

Here, unlike in *Capps*, the Parties do not argue that Tajonera was sent to new work situations

---

[149]   Rec. Doc. 425 at p. 12.

[150]   *Brown*, 984 F.2d at 678.

[151]   *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 617 (5th Cir. 1986).

[152]   *Fontenot v. Mobil Oil Exploration & Producing Se., Inc.*, 997 F.2d 881 (5th Cir. 1993).

[153]   *Id.*

daily. Grand Isle argues that Tajonera's work with D&R was only with Grand Isle, and that Tajonera would travel from vacations in the Philippines to work for Grand Isle regularly from November 2008 through November 2012.[154] Plaintiffs argue that WD 32 was the first Black Elk platform that Tajonera worked on, and that seven days is insufficient time to appreciate work conditions on a new platform.[155]  Here, like in *Fontenot*, Tajonera had worked for the same nominal employer for four years. Plaintiffs present no evidence that Tajonera objected to his work on the WD 32 platform, nor do they refute Grand Isle's assertion that Tajonera would regularly return to work with D&R after vacations. Furthermore,  the Parties do not seem to dispute that, like in *Fontenot*, Tajonera attended at least one safety meeting on the WD 32 without complaint.[156] Accordingly, this factor favors a finding of borrowed employee status.

### 5. Did the Original Employer Terminate Its Relationship with the Employee?

This factor does not require a lending employer to completely sever his relationship with the employee, because such a requirement would effectively obliterate the borrowed employee doctrine.[157] Instead, this factor evaluates the lending employer's relationship with the lending employee while the borrowing occurs.[158]  The Fifth Circuit has held that the fact that a plaintiff had no contact with his lending employer and was supervised totally by the borrowing employer's personnel while on the job site is sufficient to meet this *Ruiz* factor.[159]

---

[154] Rec. Doc. 394-2 at p. 9.

[155] Rec. Doc. 425 at p. 14.

[156] *Id.* at p. 9.

[157] *Melancon*, 834 F.2d at 1246 (citing *Capps*, 784 F.2d at 617–18).

[158] *Capps*, 784 F.2d at 617–18.

[159] *Hotard*, 308 F. App'x at 742.

Grand Isle argues that day-to-day instructions were given by Grand Isle supervisors, and D&R's contact with its employees was limited to coordinating who would go out on a job.[160] However, D&R presents contrary evidence that on the day Tajonera was injured, a D&R foreman was in charge of the D&R employees at the LACT unit, and the D&R foreman filled out the daily WP/SEA worksheet which outlined how work was to be performed that day.[161] D&R additionally argues that its supervisors retained administrative control, including "directing the work of employees, appraising employees' productivity and efficiency, handling employee complaints and grievances, disciplining employees, planning work, determining work techniques, apportioning work among employees, determining the type of equipment/tools to be used, and safety and security."[162] Both sides have presented contradictory evidence regarding whether D&R terminated its relationship with Tajonera. Accordingly, this disputed issue of fact should be decided by a jury.

### 6.   Who Furnished the Tools of Performance?

This factor emphasizes whether the borrowing or the lending employer furnished the employee's tools, place of performance, and other necessities, such as food, lodging, and transportation.[163] The case law supports a distinction between providing the place of performance and major tools for doing the work, and providing the protective equipment necessary to do the job safely. In *Owen v. Chevron U.S.A., Inc.*, the Fifth Circuit found borrowed employee status when the borrowing employer furnished the place of performance, the principal pieces of equipment (a wireline unit and lubricator), transportation, lodging, and food, while the direct employer provided

---

[160] Rec. Doc. 394-2 at p. 9.

[161] Rec. Doc. 425 at p. 15.

[162] *Id.* at pp. 15–16.

[163] *See Melancon*, 834 F.2d at 1246.

tool boxes, hand tools, safety equipment and certain specialized tools.[164] In *Melancon*, the Fifth Circuit affirmed the district court's finding that this factor favored borrowed employee status even when the lending employer furnished the welding equipment, because the borrowing employer furnished the place of employment, transportation, food, and lodging.[165]  In both *Owen* and *Melancon*, the work site was on an oil and gas drilling platform off the coast of Louisiana.

Grand Isle argues that it supplied the tools, personal protective gear, and place of performance of the work.[166] Plaintiffs appear to concede that Grand Isle supplied equipment such as torches and tanks, but argues that D&R supplied personal protective equipment including a mask, apron, and welding gauntlets.[167] Plaintiffs additionally state that meals, lodging, and the place of performance were provided by Black Elk via its contract with Grand Isle.[168]  Therefore here, like *Owen* and *Melancon*, the borrowing employer furnished the place of employment, meals, lodging, transportation, and some equipment, while the lending employer provided protective gear.   The Court accordingly finds that this factor favors borrowed employee status in this case.

### 7.    Was the New Employment Over a Considerable Length of Time?

The Fifth Circuit has noted that "[w]here the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee; however, the converse is not true."[169] In *Fontenot*, the Fifth Circuit found this factor to be neutral since the plaintiff had been

---

[164] *Owen v. Chevron U.S.A. Inc.*, 8 F.3d 20 (5th Cir. 1993).

[165] *Melancon*, 834 F.2d at 1246.

[166] Rec. Doc. 394-2 at p. 10.

[167] Rec. Doc 425 at p. 18.

[168] *Id.*

[169] *Capps*, 784 F.2d at 618.

working for Mobil, the borrowing employer, for only two days before the date of the accident.[170] Similarly, the Fifth Circuit found in Capps that this factor was neutral when the employee only worked in the new work situation for three days.[171] The Court accordingly finds that this factor is neutral here because Tajonera was working on WD 32, where he was injured, for one week prior to his accident.

### 8.   Who Had the Right to Discharge the Employee?

The Fifth Circuit has stated that the proper focus when considering who has the right to discharge the employee is whether the borrowing employer has the right to terminate the borrowed employee's services; the issue is not whether the borrowing employer could discharge the employee from the lending employer.[172] Grand Isle argues that if it had objected to any D&R employee on a particular job, the Grand Isle supervisor, Curtis Dantin, had the authority to remove the D&R employee.[173] Plaintiffs present contrary evidence that if Grand Isle complained about a D&R employee, D&R would "talk to the person what about the problem [sic]. And when there is a problem, we move them to a different platform [sic]."[174] According to Plaintiffs, D&R had the ultimate authority to remove a worker.[175] This disputed issue of fact should be decided by a jury, as both parties have presented contradictory evidence.

---

[170] *Fontenot*, 997 F.2d at * 3.

[171] *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 618 (5th Cir. 1986).

[172] *Capps*, 784 F.2d at 618.

[173] Rec. Doc. 394-2 at p. 11.

[174] Rec. Doc. 425 at p. 20 (citing Malagapo deposition, 184:17–185:3).

[175] *Id.* at p. 19.

### 9.      Who Had the Obligation to Pay the Employee?

The Fifth Circuit has held that an arrangement whereby the lending employer pays the employee and is reimbursed by the borrowing employer for the wages supports a finding of borrowed employee status.[176]  Grand Isle argues that D&R employees were guaranteed twelve hours per day, with overtime pay as authorized by the Grand Isle supervisor, and that D&R would then bill Grand Isle based on time tickets, and Grand Isle would pay D&R for the employees' time.[177] According to Grand Isle, this factor favors borrowed employee status because Tajonera's earnings were determined by the hours he worked at the direction of a Grand Isle supervisor.[178] In contrast, Plaintiffs argue that D&R paid Tajonera pursuant to a contract, and not pursuant to the hours that he worked.[179] Plaintiffs point to Malagapo's testimony, in which he states that D&R employees would be paid even when they did not work, and that he did not know if D&R ever received hourly work tickets from Grand Isle.[180] The Court therefore finds a genuine dispute of material fact regarding whether Tajonera was paid by Grand Isle or D&R.

### V. Conclusion

After analyzing the nine *Ruiz* factors, the Court finds that disputed issues of material fact

---

[176] *See Hotard v. Devon Energy Prod. Co. L.P.*, 308 F. App'x 739, 742 (5th Cir. 2009); *Capps*, 784 F.2d at 618; *see also Brown*, 984 F.2d at 679 (finding that this factor favors finding borrowed employee status where the borrowing employer must verify the employee's time tickets).

[177] Rec. Doc. 394-2 at p. 11.

[178] *Id.*

[179] Rec. Doc. 425 at p. 20 (citing Rec. Doc. 425-11).

[180] *Id.* at pp. 20–21 (citing Rec. Doc. 425-5, Malagapo deposition).

exist with respect to factors 1, 3, 5, 8, and 9.  Accordingly,

**IT IS HEREBY ORDERED** that Grand Isle's "Motion for Summary Judgment" is **DENIED.**

**NEW ORLEANS, LOUISIANA**, this 10th day of October, 2014.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**