**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**EDNA TAJONERA, et al.**                                            **CIVIL ACTION**

**VERSUS**                                                                       **NO. 13-0366**
                                                                                          **c/w 13-0550, 13-5137, 13-2496,**
                                                                                          **13-5508, 13-6022, 13-6099,**
                                                                                          **13-6413, 14-374, and 14-1714**

**BLACK ELK ENERGY OFFSHORE OPERATIONS,**   **SECTION: "G"(5)**
**L.L.C., et al.**

<u>**ORDER**</u>

  Before the Court are Defendant Black Elk Energy Offshore Operations, LLC's ("BEEOO")

"Motion for Partial Summary Judgment"[1] and "Motion for Summary Judgment."[2] Having considered

the motions, the memoranda in support and in opposition, the record, the representations made at

oral argument, and the applicable law, the Court will deny the motion for partial summary judgment,

and grant in part and deny in part the motion for summary judgment.

<u>**I. Background**</u>

*A.*   *Factual Background*

  On November 16, 2012, an explosion and fire occurred on the Black Elk Energy West Delta

32 Block Platform, located in the Gulf of Mexico approximately 17 miles southeast of Grand Isle,

Louisiana.[3] The explosion occurred while welding work was being conducted in connection with

a project to upgrade the Lease Automatic Custody Transfer system ("LACT").[4] The platform was

---

[1] Rec. Doc. 270.

[2] Rec. Doc. 360.

[3] Rec. Doc. 82 at ¶ 28.

[4] Rec. Doc. 590 at ¶ 33; Rec. Doc. 360-1 at p. 3.

owned by Black Elk Energy Offshore Operations, LLC ("BEEOO").[5] Wood Group USA, Inc.

("Wood Group"), Compass Engineering & Consultants, LLC ("Compass"), Enviro Tech Systems,

LLC ("Enviro Tech"), Grand Isle Shipyard, Inc. ("GIS"), and Shamrock Management, LLC

("Shamrock") were contractors of Black Elk allegedly involved in work being done on the Platform

that day.[6]

## B.    *Procedural Background*

This litigation involves nine consolidated cases all arising out of the November 16, 2012

explosion. In cases 13-366 and 13-550, surviving spouses of workers allegedly killed during the

explosion have brought negligence and wrongful death claims against BEEOO and its contractors.[7]

In 13-5137, 13-5508, 13-6022, 13-6099, 13-6413, and 14-374 workers allegedly injured during the

explosion have asserted negligence claims against BEEOO and its contractors.[8] In 13-2496, GIS

filed suit against BEEOO, Enviro Tech, Wood Group, and Compass claiming, among other things,

that the defendants' "combined negligence, fault, and/or strict liability," was the cause of the

explosion.[9]

Throughout this litigation, the parties have referred to the plaintiffs in the various cases as

follows:

---

[5] *Id.* at ¶ 8.

[6] *Id.* at ¶¶ 22–27.

[7] *See* Case No. 13-366, Rec. Doc. 1 (amended by Rec. Doc. 82); Case No. 13-550, Rec. Doc. 1 (amended by Case No. 13-366, Rec. Doc. 83).

[8] *See* Case No. 13-513, Rec. Doc. 1; Case No. 13-5508, Rec. Doc. 1; 13 Case No. 13-6022, Rec. Doc. 1 (transferred from the South District of Texas, Galveston Division by Case No. 13-6022, Rec. Doc. 40); Case No. 13-6413, Rec. Doc. 1; Case No. 14-374, Rec. Doc. 1 (transferred from the Southern District of Texas, Galveston Divsion by Case No. 14-374, Rec. Doc. 37).

[9] *See* Case. No. 13-2496, Rec. Doc. 1 at ¶ 11.

- 13-0366: Tajonera Plaintiffs

- 13-0550: Corporal Plaintiffs

- 13-5137: Canencia Plaintiffs

- 13-5508: Tamayo and Ilagan Plaintiffs

- 13-6022: Plaintiff Voclain

- 13-6413: Srubar and Gipson Plaintiffs

- 14-0374: Plaintiff Dominguez

Recognizing the number of individual plaintiffs spread out across each of these cases, the Court will continue with the parties' naming convention for simplicity.

On May 14, 2014, BEEOO filed a "Motion for Partial Summary Judgment,"[10] wherein it argues that, as a matter of law, it did not owe any duty to supervise or provide a safe work environment under Louisiana Civil Code art. 2315 to its independent contractors, or their employees, on the West Delta 32 platform at any time relevant to this case.[11] Memoranda in opposition were filed by the Gipson Plaintiffs,[12] Plaintiff Voclain,[13] the Canencia Plaintiffs,[14] the Tamayo Plaintiffs,[15]

---

[10] Rec. Doc. 270.

[11] *Id.* at p. 1.

[12] Rec. Doc. 409.

[13] Rec. Doc. 413.

[14] Rec. Doc. 414.

[15] Rec. Doc. 419.

the Tajonera Plaintiffs,[16] Wood Group,[17] GIS,[18] and the Dominguez Plaintiff.[19] On September 16, 2014, BEEOO filed a reply in support of its motion for partial summary judgment.[20]

On July 22, 2014, BEEOO filed a "Motion for Summary Judgment," wherein it argues that: (1) the consolidated Plaintiffs and their respective employers were Black Elk's independent contractors; (2) Black Elk neither retained nor exercised operational control over Plaintiffs or their work; and (3) there are no facts with which to impute Black Elk with independent negligence.[21] Memoranda in opposition were filed by the Gipson Plaintiffs,[22] the Canencia Plaintiffs,[23] Plaintiff Voclain,[24] Wood Group,[25] GIS,[26] Plaintiff Dominguez,[27] the Tamayo and Ilagan Plaintiffs,[28] and the Tajonera and Corporal Plaintiffs.[29] On September 16, 2014, BEEOO filed a reply brief in support

---

[16] Rec. Doc. 420.

[17] Rec. Doc. 421.

[18] Rec. Doc. 424.

[19] Rec. Doc. 438.

[20] Rec. Doc. 458.

[21] Rec. Doc. 360 at p. 1.

[22] Rec. Doc. 410.

[23] Rec. Doc. 415.

[24] Rec. Doc. 416.

[25] Rec. Doc. 423.

[26] Rec. Doc. 424.

[27] Rec. Doc. 428.

[28] Rec. Doc. 431.

[29] Rec. Doc. 435.

of its motion for summary judgment.[30] The Court held oral argument on both motions on February 25, 2015.[31]

The Court notes, and the parties acknowledged at oral argument, that BEEOO's motion for summary judgment significantly overlaps with its motion for partial summary judgment. As such, the Court will consider both sets of arguments together.

## II. Parties' Arguments

### A.   BEEOO's Arguments in Support of Summary Judgment

In its Motion for Summary Judgment, BEEOO argues that, pursuant to Master Service Agreements ("MSAs") entered into by the relevant parties, BEEOO is a principal, and GIS, Shamrock and Wood Group are its independent contractors.[32] According to BEEOO, under Louisiana law, a principal cannot be held liable for the negligence of its independent contractors unless (1) the suit arises out of the ultrahazardous activities of its independent contractors, and (2) the principal retains operational control over the independent contractor's acts or expressly or impliedly authorizes those acts.[33] BEEOO contends that Plaintiffs have not alleged that the work on the WD-32 was ultrahazardous, and that it neither retained nor exercised operational control over any of its independent contractors on WD-32 at the time of the explosion.[34]

Specifically, BEEOO contends that because it assigned responsibility to its independent contractors for their own activities under the MSAs, it did not retain contractual or actual operational

---

[30] Rec. Doc. 454.

[31] Rec. Doc. 608.

[32] Rec. Doc. 360-1 at p. 6.

[33] *Id.* at p. 7.

[34] *Id.*

5

control over GIS or its contractors.[35] BEEOO argues that it had no employee on the platform at any relevant time, and that it "had no involvement whatsoever in the step-by-step decisions and provided no 'how to' instructions with respect to the work performed by the GIS' employees on WD-32."[36] BEEOO contends that Curtis Dantin, the GIS Supervisor, testified that he did not receive step-by-step instructions from BEEOO,[37] and that Don Moss ("Moss") of Compass did not exercise any level of operational control over GIS or its workers.[38] According to BEEOO, Moss spoke to Dantin about the "overall picture of what needed to be accomplished by GIS, but left it up to GIS and Mr. Dantin to decide on how best to accomplish the work."[39] BEEOO contends that such limited interactions do not rise to the level needed to exercise control, stating that a principal must have "expressly ordered the independent contractor to engage in an unsafe work practice that eventually caused an injury to the plaintiff."[40] Finally, BEEOO argues that Chris Srubar ("Srubar"), Wood Group Lead Operator, testified that neither BEEOO nor Don Moss gave him instructions on how to do his job.[41]

Largely repeating arguments made in its motion for partial summary judgment,[42] BEEOO next contends that it is not independently negligent under Articles 2315 or 2316 because it had no duty to provide its independent contractors with a safe place to work, as evidenced by the fact that

---

[35] *Id.* at p. 8 (citing *Klein v. Cisco Eagle, Inc.*, No 37-398 (La. App. 2 Cir. 2003); 855 So.2d 844, 850).

[36] *Id.* at pp. 8–9.

[37] *Id.* at p. 9.

[38] *Id.* at p. 10 (citing Dantin Tr., Ex. C, at p. 138).

[39] *Id.* at p. 11.

[40] *Id.* at p. 10 (quoting *Graham v. Amoco Oil Co.*, 21 F.3d 643, 646 (5th Cir. 1994)).

[41] *Id.* at p. 12 (citing Srubar Tr., Ex. F, at p. 133).

[42] *See* Rec. Doc. 270-1 at pp. 9–13.

each contractor provided its own supervisor on site.[43] Rather, BEEOO argues, the duty to inspect and ensure the safety of personnel on the platform was breached by the parties who voluntarily assumed that duty: BEEOO's independent contractors.[44] BEEOO argues that it had no duty to supervise, direct, instruct, or otherwise ensure that its contractors' employees perform their work safely because, under Louisiana law and Fifth Circuit precedent, it was entitled to rely on the expertise of its independent contractors to perform its work in a safe manner.[45] Next, BEEOO contends that, as a principal and platform owner, it had no legal duty to correct or eliminate hazards.[46] BEEOO's position is that it cannot be held independently negligent because it did not exercise operational control over the LACT upgrade work, had no knowledge as to the exact details of the work, and was not involved in directing the GIS workers.[47] Specifically, BEEOO argues that as a condition of entering into an MSA with BEEOO, each independent contractor agreed to retain all responsibility regarding safety and to perform all services in accordance with all applicable safety regulations, precautions, and procedures.[48]

Finally, BEEOO argues that it was not negligent under Article 2317.1 for alleged defects and hazardous conditions on the platform.[49] According to BEEOO, Article 2317.1, characterized by

---

[43] Rec. Doc. 360-1 at p. 13.

[44] *Id.* at p. 14.

[45] *Id.* (citing *Hawkins v. Evans Cooperage Co.*, 766 F.2d 904, 908 (5th Cir. 1985)).

[46] *Id.* at pp. 16–17 (citing *Dupre v. Chevron U.S.A., Inc.*, 33 F.3d 7 (5th Cir. 1994); *Thomas v. Burlington Resources Oil & Gas Co.*, 2000 WL 1528082 (E.D. La. 2000) (Barbier, J.); *Iglesias v. Chevron U.S.A., Inc.*, 656 F. Supp. 2d 598, 601 (E.D. La. 2009) (Zainey, J.)).

[47]   *Id.* at p. 13.

[48] *Id.* at p. 18.

[49] *Id.*

7

Plaintiffs as a strict liability law, imposes a negligence standard in cases involving defective things based on a custodian's knowledge or constructive knowledge of the defect.[50] BEEOO admits that it owns the WD-32 platform, but argues that the platform was not in BEEOO's custody at the time of the incident because BEEOO had no employees or personnel aboard.[51] Additionally, BEEOO argues that its platform, piping, and tanks were not defective under Article 2317.1.[52] Specifically, BEEOO contends that the purpose of tanks and piping on a production platform is to hold and move hydrocarbons, and "[t]hus, the fact that there were allegedly hydrocarbons in piping or tank aboard an oil and gas platform does not constitute a defect or unreasonably hazardous condition as contemplated by Article 2317.1."[53] Even if the pipe was defective because it had not been purged, according to BEEOO, it had no actual or constructive knowledge of the defect.[54] Specifically, BEEOO contends that the GIS workers performing hot work on the LACT piping that led to the explosion presumably had no knowledge that the pipe or tank had not been purged; therefore, BEEOO similarly would have had no knowledge of that condition either, particularly because it had no employees on the platform.[55]

## B.    *Gipson Plaintiffs' Arguments in Opposition*

In opposition, Gipson Plaintiffs argue that BEEOO, through its construction superintendent,

---

[50] *Id.* at p. 19 (citing *Gros v. Warren Props. Inc.*, 12-2184, 2012 WL 5906724, at *10 (E.D. La. Nov. 26, 2012) (Barbier, J.)).

[51] *Id.* at p. 20.

[52] *Id.* at pp. 20–21 (citing *Hammons v. Forest Oil Corp.*, 06-9173, 2008 WL 348765 (E.D. La Feb. 7, 2008) (Africk, J.)).

[53] *Id.* at pp. 21–22.

[54]  *Id.* at p. 22.

[55] *Id.* at p. 23.

Monty Richard ("Richard"), specifically directed how the LACT upgrade was going to be performed by providing step by step instructions for the LACT upgrade work.[56] As evidence, Gipson Plaintiffs cite an e-mail Richard sent to his BEEOO supervisor seven hours after the explosion, outlining his specific instructions for the LACT work, as well as a deposition in which Plaintiffs claim that Richards specifically stated that he was the one giving the step by step instructions on how LACT work was to be performed.[57] Moreover, Gipson Plaintiffs aver that Richard's specific instructions concerning the LACT work were in direct violation of BEEOO's hot work safety policies, which state that "offshore welding and burning shall be minimized by onshore fabrication when feasible."[58]

Gipson Plaintiffs contend that Louisiana law imposes liability on a platform owner for the negligent acts of an independent contractor when the platform owner retains at least some degree of operational control over the manner in which the work is done.[59] According to Gipson Plaintiffs, "[n]ot only did Black Elk dictate the precise step by step procedure on how the LACT work was to be performed, and therefore exercised operational control over the project, but their specific step by step instructions were in violation of their own safety manual requiring the minimizing of field welds in favor of pre-fabrication onshore."[60]

### C.   *Canencia Plaintiffs' Arguments in Opposition*

Canencia Plaintiffs first incorporate the opposition initially filed against BEEOO's motion

---

[56] Rec. Doc. 410 at p. 2.

[57] *Id.* (citing Richard E-mail, Ex. A; Richard Dep. at pp. 325–27, Ex. B).

[58] *Id.* at p. 4.

[59] *Id.* (citing *Boutwell v. Chevron U.S.A., Inc.*, 864 F.2d 406 (5th Cir. 1989); *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548 (5th Cir. 1987)).

[60] *Id.* at p. 6.

for partial summary judgment,[61] wherein they argue that the Code of Federal Regulations places affirmative duties on BEEOO to provide workers with a safe place to work, and that BEEOO assumed those duties when it formulated and implemented its Safety Manual.[62] In the opposition to the motion for partial summary judgment, Canencia Plaintiffs contend that, in formulating a "Safe Work Manual" pursuant to the requirements of federal regulations and requiring its contractors to follow that manual, BEEOO assumed the duty of providing for the safety of the independent contractors on its platform.[63] Canencia Plaintiffs extensively quote a report issued by the Bureau of Safety and Environmental Enforcement ("BSEE"), in which it found it was probable that BEEOO had violated federal regulations and its own safety manual and that such violations were possible contributing causes of the platform explosion.[64] Canencia Plaintiffs contend that BEEOO could not contract away its safety responsibilities in light of the new federal regulations, passed in the shadow of Deepwater Horizon incident, imposing the ultimate responsibility on BEEOO to ensure that safety protocols were followed.[65]

In the alternative, Canencia Plaintiffs argue that a genuine issue of material fact exists as to whether BEEOO retained operational control over its independent contractor's acts, or expressly or impliedly authorized those acts.[66] Canencia Plaintiffs note that they were employed by D&R Resources, LLC ("D&R"), with whom BEEOO did not contract, and therefore there is no contract

---

[61] Rec. Doc. 415 at p. 3.

[62] Rec. Doc. 414 at p. 5 (citing 30 C.F.R. § 250.1900 *et seq.*).

[63] *Id.* at p. 6 (citing Dep. of Kenneth Anthony, a former BEEOO employee, Ex. 1 at p. 29).

[64] *Id.* at p. 7.

[65] *Id.* at p. 11.

[66] *Id.* at p. 13.

delegating safety responsibilities to D&R.[67] Similarly, Canencia Plaintiffs contend, BEEOO did not have a valid contract with GIS designating GIS as an independent contractor, and thus the independent contractor defense could not apply to their relationship, either.[68]

Next, Canencia Plaintiffs contend that former BEEOO Chief Well Operations Officer Carl Hammond ("Hammond") provided conclusive evidence that BEEOO retained and asserted operational control over its independent contractors' acts, or expressly or impliedly authorized those acts.[69] Canencia Plaintiffs cite statements by Hammond that allegedly prove that BEEOO exercises control over the details of how contractors perform their work on the platform, that it was BEEOO's policy to have an engineer or superintendent on the platform to oversee work performed by third party contractors, that BEEOO had a policy requiring every line and tank containing hydrocarbons on its platforms to be purged and rendered inert before hot work could begin, and that, in sum, BEEOO did not cede total control of its platforms to contractors.[70] Canencia Plaintiffs also cite statements by Kenneth Anthony ("Anthony"), who was BEEOO's operation supervisor on November 16, 2012, asserting that BEEOO was "always in charge of safety" for platform operations, that Anthony or another employee on duty for BEEOO would provide direction to contractors on BEEOO's platform, and that Anthony was in control of the details of when hot work permits could be issued by Wood Group.[71]

In opposition to BEEOO's motion for summary judgment, Canencia Plaintiffs challenge

---

[67] *Id.* at pp. 13–14.

[68] *Id.* at p. 14.

[69] *Id.* at p. 17.

[70] *Id.* at pp. 17–19 (citing Unsworn Decl. Under Penalty of Perjury of Carl Hammond, Ex. 11).

[71] *Id.* at p. 20 (citing Dep. of Kenneth Anthony, Ex. 1, at pp. 243, 264–65).

11

BEEOO's assertion that it did not retain operational control over GIS, and argue that regardless, all they are required to show is that BEEOO retained operational control over any contractor on the platform, not all contractors.[72] Canencia Plaintiffs argue that Chris Srubar, Wood Group Lead Operator, testified that BEEOO foremen Anthony and Mark Martin ("Martin") gave him instructions to "delegate or start splitting up jobs," which indicates that BEEOO retained operational control.[73] They additionally contend that Richard gave Don Moss and George Wolfe of Compass detailed instructions regarding the addition of the divert valve and piping to the LACT unit.[74]

Next, Canencia Plaintiffs argue that BEEOO is independently negligent under Louisiana Civil Code article 2315 and/or 2316 because it breached "the duty to construct, maintain, monitor, and operate the platform in a manner compatible with applicable industry codes, consensus standards, and generally accepted practice as well as in compliance with all applicable governmental regulations, as well as the duty to ensure that it manages safety hazards on the platform."[75] Canencia Plaintiffs argue that Larry Combs, Vice President of Operations for BEEOO, testified that BEEOO developed a plan for upgrading the LACT unit by November of 2011, and that Anthony testified that the plan would require hot work and field welds.[76] Next, they point to emails sent by Richard to Compass employees stating that "we need to install while crew is on location."[77] Plaintiffs state that

---

[72] Rec. Doc. 415 at p. 4.

[73] Id. at p. 5 (citing Dep. of Chris Srubar, Ex. 3, at p. 550).

[74] Id. at p. 6.

[75] Id. at pp. 7–8.

[76] Id. at p. 8 (citing Dep. of Larry Combs, Ex. 5, at p. 66; Dep. of Kenneth Anthony, Ex. 1, at p. 73).

[77] Id. at p. 9 (citing E-mails dated Nov. 9, 2012, Ex. 14).

Moss sent daily construction reports to Richard and several other BEEOO employees.[78] Canencia Plaintiffs allege that BEEOO knew that field welds would take place on November 16, 2012 but failed to notify Srubar, the Person-in-Charge of the platform "and the last line of defense against a catastrophic explosion."[79] Canencia Plaintiffs allege that BEEOO ignored a known hazard of performing field welds on piping containing hydrocarbons, elected to ignore BEEOO's Welding, Burning, and Hot Tapping Safe Practices and Procedures Plan, and did not wait for piping to be fabricated that would have completely eliminated the need for field welds."[80]

Finally, Canencia Plaintiffs argue that BEEOO is negligent pursuant to Louisiana Civil Code article 2317.1.[81] They cite *Bethea v. Great Atlantic & Pacific Tea Co.* for the argument that "custody or garde will not be shared or transferred when there is a limited ability to inspect the premises, limited access to enter the premises, and an inability to alter the premises."[82] Here, they argue, BEEOO had unlimited access to enter the platform, and at least once daily, Anthony would inspect the platform personally or contact a platform operator "and communicate as to what was going on."[83]

### D.    *Voclain's Arguments in Opposition*

Voclain adopts by reference his opposition and related pleadings and exhibits submitted in opposition to BEEOO's motion for partial summary judgment,[84] wherein he argues that there was

---

[78] *Id.* at p. 10 (citing Dep. of Don Moss, Ex. 2, at p. 26).

[79] *Id.* at p. 11.

[80] *Id.* at p. 15.

[81] *Id.* at p. 17.

[82] *Id.* (citing *Bethea v. Great Atlantic & Pacific Tea Co.*, 2007-1385 (La. App. 4 Cir. 9/30/99); 22 So.3d 1114, 1115).

[83] *Id.*

[84] Rec. Doc. 416 at p. 1.

no MSA between BEEOO and Enviro-Tech, Voclain's employer, and that without a contract shifting responsibilities to Enviro-Tech, BEEOO owes a duty of reasonable care to provide Vocalin with a safe place to work.[85] Voclain argues that the contractual relationship and corresponding delineation of duties appears determinative in all the cases sited by BEEOO, and that therefore Louisiana negligence law, federal safety regulations, and BEEOO's own assumption of duties, which all place a duty on BEEOO, are unaltered by any contractual shifting of duties.[86] Voclain also claims that federal regulations place an affirmative duty on BEEOO, relying on arguments similar to those alleged by Canencia Plaintiffs, *supra*.[87]

E.     ***Wood Group's Arguments in Opposition***

Wood Group argues that BEEOO failed to comply with important provisions of its "Welding, Burning and Hot-Tapping - Safe Practices and Procedures Plan," which Wood Group characterizes as "a document it was required to provide to the federal government before beginning operations."[88] According to Wood Group, BEEOO initiated work on the LACT unit in February 2012.[89] At that time, Wood Group staes, BEEOO's Operations Supervisor, Troy Durkes ("Durkes"), was present on the Platform to oversee the project.[90] The original design, according to Wood Group, called for new piping to be installed using hot work techniques, and Durkes "made the decision to shut down the job due to lack of authorization and to allow for the re-design of the project to eliminate filed

---

[85] Rec. Doc. 413 at p. 2.

[86] *Id.* at p. 3.

[87] *Id.* at pp. 5–9.

[88] Rec. Doc. 423 at pp. 1–2.

[89] *Id.* at p. 2.

[90] *Id.*

14

[sic] welds (hot work)."[91] In November 2012, Wood Group argues, Monte Richard of BEEOO instructed Don Moss of Compass that the LACT unit piping was to be installed.[92] According to Wood Group, after the pre-fabricated section of pipe that was integral to the LACT construction could not be located aboard the platform, Richard "made the decision that, instead of having the missing pipe re-fabricated, the construction crew would revert to original design which required welding to perform hot work."[93]

According to Wood Group, BEEOO was in control of its subcontractors with respect to the LACT unit project, but failed to submit a welding plan or send a welding supervisor familiar with the plan to inspect the worksite and advise, in writing, that the area was safe to weld.[94]

## F.  GIS's Arguments in Opposition

First, GIS contends that, following revisions to the Code of Federal Regulations in the wake of the Deepwater Horizon incident, there is a serious question as to whether the independent contractor defense remains viable.[95] GIS argues that 30 C.F.R. § 250.1900 has effectively legislatively overruled any prior case law that permitted a platform owner or operator to defer to a contractor.[96] Therefore, according to GIS, the primary obligation for safety on an offshore platform belongs to the owner and operator, regardless of any contractual arrangements it entered into prior

---

[91] *Id.* (citing Feb. 20, 2012 E-mail of Troy Durkes, Ex. B).

[92] *Id.* (citing Nov. 2, 2012 E-mail of Monte Richard, Ex. C).

[93] *Id.* at p. 3 (citing Nov. 12, 2012 E-Mail from Monte Richard, Ex. E).

[94] *Id.* at p. 4 (citing 30 C.F.R. § 250.109, 110, 113).

[95] Rec. Doc. 424 at p. 6.

[96] *Id.* at p. 7

15

to November 2011.[97]

Next, GIS contends that it was not an independent contractor of BEEOO, so if GIS is found liable in this matter, BEEOO cannot insulate itself from vicarious liability by virtue of the independent contractor defense.[98] GIS claims that it was working on the platform pursuant to the Black Elk - GIS Business Alliance Agreement ("Alliance Agreement"), signed by the parties and made effective May 5, 2010, not pursuant to an MSA.[99] GIS states that it entered into an MSA with "Black Elk Energy, LLC" ("BEE") which is distinct from BEEOO.[100] According the GIS, the Alliance Agreement did not state that GIS was BEEOO's independent contractor or that BEEOO ceded control over work to GIS.[101]

GIS additionally argues that BEEOO fails to provide undisputed material facts supporting its contention that it was in a principal/independent contractor relationship with all of the contractors on the platform at the time of the incident.[102] Specifically, GIS contends that BEEOO has not alleged a contractual relationship with Compass or Enviro-Tech.[103] Moreover, according to GIS, the MSAs between BEEOO and GIS, Wood Group, and Shamrock were entered into on behalf of BEE, not on behalf of BEEOO.[104] According to GIS, there are multiple questions of fact with respect to which

---

[97] *Id.*

[98] *Id.*

[99] *Id.* (citing Alliance Agreement, Ex. A).

[100] *Id.* at p. 10.

[101] *Id.* at p. 8.

[102] *Id.* at p. 9.

[103] *Id.* at p. 10.

[104] *Id.* (citing Ex. B to Rec. Doc. 270-3, at p. 1.; Ex. B to Rec. Doc. No. 360-4, at p. 1).

parties entered into the alleged contracts, and whether the contracts establish independent contractor/principal relationships.[105]

Moreover, GIS alleges that BEEOO "absolutely directed how each contractor was to perform its job, and, in fact, as [regarding] the specific work being performed at the time of the incident, changed the scope of work to suit its own needs."[106] GIS contends that, although BEEOO tried to "contractually set up a situation where it could claim to be a 'hands-off' operator," in reality, BEEOO retained operational control over the work performed on the West Delta 32 platform.[107] GIS avers even without direct employees present on the platform, BEEOO nevertheless maintained extensive control.[108] In support of its argument, GIS contends that Kenneth Anthony, the BEEOO supervisor on the platform, testified that he monitored work on the platform on a daily basis and instructed the PIC, Wood Group employee Chris Srubar, what to do.[109] GIS alleges that Srubar testified that BEEOO was "calling the shots.[110] GIS further points to the testimony of BEEOO's construction supervisor, Monte Richard, wherein he allegedly stated that he provided Compass's construction supervisor, Don Moss, with step-by-step instructions for performing the work at issue.[111] GIS points to emails sent by Richard to Doug Fehr, BEEOO's Chief Operating Officer, approximately eight hours after the incident, as well as Richard's deposition testimony, for the

---

[105] *Id.* at p. 11.

[106] *Id.*

[107] *Id.* at p. 12.

[108] *Id.*

[109] *Id.* at p. 14 (citing Ex. C at pp. 50–52).

[110] *Id.* (citing Dep. Tr. of Chris Srubar, Ex. D, at p. 433).

[111] *Id.* at pp. 14–15.

argument that BEEOO "spelled out the precise manner in which the work should proceed."[112] GIS argues that BEEOO expressly retained the right to oversee the work performed by Wood Group and Shamrock, and that the contractors were obligated to follow BEEOO's safety regulations.[113]

Additionally, GIS avers that BEEOO cannot avail itself of the independent contractor defense because it gave express or implied authorization to an unsafe practice.[114] GIS asserts that BEEOO impliedly authorized the work because it had a specific procedure for issuing hot work permits, but did not require this procedure to be followed.[115] GIS points to the testimony of Srubar, who apparently did not believe he was obligated to comply with BEEOO's policies and believed he had authority from BEEOO to allow Philip Broussard to issue a hot work permit on the date of the incident.[116] GIS contends that BEEOO expressly authorized the work because BEEOO approved the welding on the LACT unit.[117] GIS' position is that the conditions on the platform were created by BEEOO, not by any contractors.[118] Specifically, GIS contends that it was BEEOO's decision to change the manner and method of work from prefabbed construction that required no hot work to requiring field welds, which is enough to make BEEOO independently liable under Article 2317.1.[119]

---

[112] *Id.* at p. 16 (citing E-mail from Monte Richard to Doug Fehr, dated Nov. 16, 2012, at 4:21 p.m., Ex. F; Ex. D at pp. 325–27).

[113] *Id.* at p. 17.

[114] *Id.* at p. 19 (citing *Sandbom v. BASF Wyandotte Corp.*, 647 So.2d 349 (La. App. 1 Cir. 1996)).

[115] *Id.* at p. 20.

[116] *Id.* at p. 21 (citing Ex. D at p. 470).

[117] *Id.* at p. 22.

[118] *Id.* at p. 25.

[119] *Id.*

## G.    Plaintiff Dominguez's Arguments in Opposition

First, Dominguez incorporates his arguments in opposition to BEEOO's motion for partial summary judgment,[120] wherein he argues that BEEOO did not have contracts containing independent contractor clauses with several of the key companies performing work on its platform.[121] Specifically, Dominguez alleges that no such contracts existed with his employer, D&R, or with Compass, Wood Group, or GIS.[122] Dominguez contends that BEE, not BEEOO, had a contract with Wood Group, and that even if BEEOO could benefit from BEE's contract, Wood Group and BEE later entered into a separate agreement in October 2011 that required Wood Group to follow detailed instructions from BEE ("Bridging Agreement").[123] The Bridging Agreement, according to Dominguez, provided Wood Group with specific instructions for performing hot work, and that such instructions are inconsistent with an independent contractor relationship.[124]

Next, Dominguez contends that BEEOO is vicariously liable for any negligent acts committed by Don Moss of Compass because Moss was a "borrowed employee."[125] According to Dominguez, Moss was BEEOO's "representative" on the platform, serving as its "eyes and ears" and ensuring that GIS and D&R workers were doing what they were required to do.[126] Moreover, Dominguez contends, even if the work in question was performed by independent contractors,

---

[120] Rec. Doc. 428 at p. 4.

[121] Rec. Doc. 438 at p. 5.

[122] *Id.*

[123] *Id.* at p. 7.

[124] *Id.* at pp. 7–8.

[125] *Id.* at p. 8 (citing *Morgan v. ABC Mfr.*, 710 So. 2d 1077, 1082 (La. 1998)).

[126] *Id.* at p. 9 (citing Don Moss. Dep., Ex. K, at pp. 119, 141, 441–42, 469).

BEEOO exercised operational control over the work in question, citing much of the same evidence presented by other memoranda in opposition.[127]

In opposition to BEEOO's motion for summary judgment,[128] Dominguez argues that BEEOO is independently negligent for changing the scope of work to require offshore hot work, even though it previously recognized the safety risks posed by that plan.[129] Specifically, according to Dominguez, the original plan for the LACT unit job required offshore welding "in the field," but, in accordance with its own safety policy, BEEOO changed this plan to eliminate the unnecessary hazards associated with hot work on the facility.[130] Under the new plan, Dominguez contends, no hot work would be performed on the platform.[131] Dominguez alleges that Monte Richard subsequently decided to revert back to the original plan, and thereby order hot work on the pipe.[132] Therefore, according to Dominquez, BEEOO expressly ordered the job to be done in a manner that it previously determined was unsafe, and consequently BEEOO committed independent acts of negligence.[133]

Dominguez next argues that BEEOO violated BSEE safety regulations, which require work to be performed "in a safe and workmanlike manner" and hot work to be performed only pursuant to an approved Welding Plan.[134] Dominguez points to the deposition of Larry Combs, BEEOO

---

[127] *Id.* at pp. 9–18.

[128] Rec. Doc. 360.

[129] Rec. Doc. 428 at p. 4.

[130] *Id.* at p. 5.

[131] *Id.*

[132] *Id.* at pp. 5–6 (citing Anthony Dep., Ex. F at pp. 174–75; 177, 179–81).

[133] *Id.* at p. 6.

[134] *Id.* at p. 7 (citing 30 C.F.R. § 250.109–11; 30 C.F.R. §282.27(a)).

corporate representative, where he testifies that he is unaware whether BEEOO gave a Welding

Plan to Curtis Dantin, GIS, Don Moss, Chris Srubar, Compass, or Wood Group.[135] Dominguez

contends that BEEOO's failure to follow these safety regulations constitutes negligence per se.[136]

## H.   Tamayo Plaintiffs' Arguments in Opposition

Tamayo Plaintiffs adopt all responses and oppositions to BEEOO's motion for summary

judgment.[137] In opposition to BEEOO's motion for partial summary judgment, Tamayo Plaintiffs

repeat many of the arguments made by other parties, specifically that federal regulations required

BEEOO to retain operational control,[138] and that BEEOO in fact retained operational control.[139]

## I.   Tajonera and Corporal Plaintiffs' Arguments in Opposition

First, Tajonera and Corporal Plaintiffs argue that there are triable issues of fact as to whether

BEEOO retained operational control because:

> Faced with a self-imposed deadline, to avoid production losses, [BEEOO] changed its
> original modification plans and thereby unilaterally changed the manner by which the
> construction crew was to complete the project. With these changes, [BEEOO] made the
> ultimate decision on how the work on the LACT unit would be accomplished, and
> substituted its method for those of the contractors aboard the platform.[140]

Like the other Plaintiffs in this matter, Tajonera and Corporal Plaintiffs argue that the November 16,

2012 email from Monte Richard to Doug Fehr, BEEOO's Facilities Department Manager/Vice

President of Facilities, indicates that BEEOO laid out the step-by-step process by which the

---

[135] *Id.* at p. 8 (citing Dep. of Black Elk Corporate Representative Larry Combs, Ex. G, at pp. 410, 414–15).

[136] *Id.* at p. 9.

[137] Rec. Doc. 431.

[138] Rec. Doc. 419 at pp. 2–4.

[139] *Id.* at pp. 4–5.

[140] Rec. Doc. 435 at p. 10.

contractors were to prepare for the LACT unit project, and how the work would be performed.[141] Moreover, according to Plaintiffs, BEEOO unilaterally chose to change the method by which the LACT upgrade would be accomplished.[142]

Next, Tajonera and Corporal Plaintiffs contend that there are triable disputes of fact as to whether BEEOO was independently negligent.[143] First, they argue that BEEOO owed a duty of care pursuant to Louisiana Civil Code art. 2315 to the contractor employees on the platform.[144] Plaintiffs contend that BEEOO gave specific instructions to the contractors aboard the platform, which BEEOO owned, and expressly ordered the work to be done on the LACT unit on November 16, 2012.[145] According to Plaintiffs, BEEOO created a hazardous environment, and therefore had a duty to make that environment safe.[146] Moreover, Plaintiffs argue that Richard voluntarily undertook the task of directing the contractors how to perform the LACT unit project, and that voluntarily assuming a task imposes a duty to perform those tasks in a reasonable and prudent manner.[147]

Plaintiffs argue that BEEOO breached its duty of care by failing to comply with the relevant federal regulations or its own Safe Work Manual.[148] According to Tajonera and Corporal Plaintiffs, BSEE investigated the cause of the explosion and found that BEEOO failed to properly involve all

---

[141] *Id.*

[142] *Id.* at pp. 13–14.

[143] *Id.* at p. 14.

[144] *Id.*

[145] *Id.* at p. 16.

[146] *Id.*

[147] *Id.* (citing *Crane v. Exxon Corp., USA*, 613 So.2d 214, 221 (La. Ct. App. 1992)).

[148] *Id.* at p. 17.

personnel in the planning and execution of the hot work, failed to manage its contractors, failed to perform the necessary actions to ensure the plan was followed, failed to demand accountability, failed to include a mechanism for the establishment and implementation of safe work practices, failed to include a mechanism to ensure that the contractors followed safe work practices and procedures, failed to make certain that the contractors were conducting activities in accordance with the requirements set out in the SEMS, and failed to inform the contractors of any known hazards, including hazardous or flammable chemicals.[149] Tajonera and Corporal Plaintiffs additionally argue that BEEOO is liable under Louisiana Civil Code art. 2317.1 because BEEOO had custody of the platform by virtue of its ownership and control over the platform, created an unnecessary hazard on the platform, knew of the unreasonable risk of harm to workers, and did not take reasonable care in preventing that harm.[150]

**J.      *BEEOO's Reply in Further Support of its Motion for Summary Judgment***

In reply, BEEOO argues that Plaintiffs downplay GIS' negligent acts that caused the explosion because they fear GIS could invoke borrowed employer immunity and thereby avoid any judgment against it in tort.[151] BEEOO argues that Plaintiffs take contradicting views on BEEOO's activities, simultaneously blaming it for not taking a more active role and adequately supervising the work, and alleging that BEEOO had "direct supervision" over the work to such a degree that it unequivocally exercised operational control over all work.[152]

---

[149] *Id*. at p. 17–18.

[150] *Id.* at pp. 20–22.

[151] Rec. Doc. 454 at p. 1.

[152] *Id.*

First, BEEOO adopts the arguments made in its reply in support of its motion for partial summary judgment.[153] In that reply, BEEOO argues that it did not retain operational control, but merely provided safety guidelines to its contractors, without telling them how to do their work.[154] BEEOO argues that it did not have any employees on the platform at any time relevant to Plaintiffs' allegations, and therefore it was impossible for it to control any aspect of the work being performed by the contractors.[155] BEEOO challenges Plaintiffs' reliance on the depositions of Kenneth Anthony, who it claims was on vacation on November 16, 2012, and Larry Combs and Monte Richard, who BEEOO contends were not on the West Delta 32 in November 2012.[156] Instead, BEEOO argues, none of the workers aboard the platform suggested that BEEOO exercised operational control over them, citing the depositions of Srubar, Moss and Dantin.[157]

Next, BEEOO argues that Richard's November 16, 2012 e-mail, relied on by many of the plaintiffs, does not evidence operational control.[158] BEEOO contends that the e-mail is evidence that Richard simply had a discussion with Moss and Wolfe, and that Richard's only communication concerning the LACT unit was with Moss, not anyone with GIS, D&R, or Wood Group.[159] Moreover, BEEOO contends, even if Richard's e-mail provided GIS with step-by-step instructions sufficient to find operational control, GIS failed to follow those instructions; had they done so, the

---

[153] *Id.* at p. 2 (citing Rec. Doc. 458).

[154] Rec. Doc. 458 at p. 2.

[155] *Id.*

[156] *Id.*

[157] *Id.* at pp. 2–3.

[158] *Id.* at p. 4.

[159] *Id.*

explosion would not have happened.[160]

Next, BEEOO contends that the declaration of Carl Hammond, former Chief Well Operations officer at BEEOO, relied upon by Plaintiffs, was "undoubtedly drafted by counsel to serve their purposes" and is therefore "utterly unreliable and irrelevant."[161] BEEOO avers that Hammond is "clearly a disgruntled ex-employee" of BEEOO who was terminated in September 2012 and his allegations concerning what happened on West Delta 32 in November 2012 are "pure speculation."[162]

BEEOO avers that the 2011 BSEE regulations (referred to by BEEOO as the "Workplace Safety Rule"), cited by many plaintiffs as evidence that BEEOO had a legal duty to provide safe working conditions, do not create any independent cause of action or impose legal duties upon a platform owner to be enforced by this Court.[163] BEEOO admits that there are no recent cases analyzing the new regulations, but asserts that the Fifth Circuit has addressed former, comparable regulations , and notes that no opposing parties have offered the Court any legal basis to find that the new federal regulations overturned all prior case law on point.[164] BEEOO alleges that the Workplace Safety Rule merely subjects violators to civil or criminal penalties imposed by the government, but does not create private civil liability.[165] BEEOO maintains that while its safety plans outlined how it hoped to select contractors and maintain a safe culture offshore, the plans "did

---

[160] *Id.* at p. 5.

[161] *Id.*

[162] *Id.* at p. 6.

[163] *Id.* at pp. 6–7.

[164] *Id.* at p. 7.

[165] *Id.* at p. 8.

not and could not impose any legal duty upon [BEEOO] beyond those already imposed by law."[166]

In its reply in further support of its motion for summary judgment, BEEOO contends that Plaintiffs have ignored facts supporting BEEOO's argument that it was not independently negligent, namely: (1) BEEOO had no employees on the platform; (2) the only contact BEEOO had with platform personnel was a daily phone call and a few occasional e-mails; (3) the West Delta 32 could only be brought back online when Energy XXI's 30E platform came back online, which would not happen for at least several weeks; (4) despite Richard's e-mail documenting a conversation concerning the performance of LACT work, GIS was not aware of the conversation and did not follow the steps discussed; (5) BSEE approved the Management of Change order to allow field welds on the LACT unit; (6) GIS brought three welders and welding equipment to the West Delta 432 to perform welding work on the platform; and (7) using the prefabricated piping as originally intended still required two welds.[167] BEEOO contends that the decision to field weld the LACT piping was not negligent, noting that Plaintiffs have incorrectly assumed that a "flange-to-flange" pre-fabricated design "would have eliminated the need for field welds," and arguing that the installation of flanges on the existing LACT pipe would still have required welding.[168]

According to BEEOO, it reverted back to its original, BSEE-approved plan allowing GIS to rebuild the piping on the platform because original "flange-to-flange" piping that had been sent to West Delta 32 "turned up missing" for unknown reasons.[169] BEEOO argues that although its

---

[166] *Id.* at p. 9.

[167] Rec. Doc. 454 at pp. 3–4.

[168] *Id.* at p. 4.

[169] *Id.* at p. 5.

internal welding procedures seek to minimize hot work on platforms when feasible, welding is a common event in offshore construction and often necessary.[170] According to BEEOO, two field welds would have been required under either plan, and the new plan added only two additional field welds.[171]

Moreover, BEEOO avers, it did not rush the LACT unit work, citing testimony by Moss and Richard stating that they knew as of November 14, 2012 that West Delta 32 could not come back online until Energy XXI's West Delta 30E platform returned online, and that BEEOO would be done with its repairs before that time.[172] According to BEEOO, Moss was retained to coordinate the construction, and it was his job to inform Wood Group of where and when hot work was to be performed.[173] Therefore, BEEOO contends, it cannot be held liable for Moss's alleged negligence because he was not BEEOO's employee, and BEEOO merely provided Moss with the scope of work and communicated with him by phone daily to check on the progress of the work.[174]

Next, BEEOO contends that it was not negligent for failure to ensure its contractors were following its policies.[175] According to BEEOO, it signed Bridging Agreements with its contractors, including GIS and Wood Group, requiring them sign off that they had reviewed BEEOO's policies and procedures and would adhere to them, and BEEOO was justified in relying upon those

---

[170] *Id.*

[171] *Id.* at p. 6.

[172] *Id.* (citing Dep. of Don Moss, Rec. Doc. 415-2, at pp. 86–88, 217–18; Dep. of Monte Richard, Rec. Doc. 415-4, at p. 137).

[173] *Id.* at p. 7.

[174] *Id.*

[175] *Id.*

agreements.[176] BEEOO further contends that the BSEE report cited by Plaintiffs is hearsay and therefore improper summary judgment evidence, and, moreover, BSEE "notoriously paints with a broad brush in its reports and always looks to the platform owners as the party having to answer for the transgressions of its contractors."[177] Finally, BEEOO avers that it was not negligent under Article 2317.1, arguing that Plaintiffs have provided no evidence of any alleged defect on the platform.[178]

### III. Standard on a Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[179] When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[180] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[181] If the record, as a whole, could not lead a rational trier of fact to find for the non-moving party, then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law."[182] The

---

[176] *Id.* at p. 8.

[177] *Id.*

[178] *Id.* at p. 9.

[179] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[180] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[181] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[182] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[183]

The party seeking summary judgment bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[184] To withstand a motion for summary judgment, a non-moving party must show that there is a genuine issue for trial by presenting evidence of specific facts.[185] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[186] Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[187]

## IV. Analysis

BEEOO states that it is entitled to summary judgment because: (1) the consolidated Plaintiffs and their respective employers were BEEOO's independent contractors; (2) BEEOO neither retained nor exercised operational control over Plaintiffs or their work; and (3) there are no facts

---

[183] *See, e.g., Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[184] *Celotex*, 477 U.S. at 323.

[185] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012), citing *Anderson*, 477 U.S. 242 at 248-49.

[186] *Little*, 37 F.3d at 1075.

[187] *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987); Fed. R .Civ. P. 56(c)(2).

with which to impute BEEOO with independent negligence.[188] The Court will address each argument in turn.

**A.**     ***Whether the Consolidated Plaintiffs and Their Respective Employers Were BEEOO's Independent Contractors***

As a threshold issue, the parties dispute which of the parties working on West Delta 32 were BEEOO's independent contractors. Shamrock did not file an opposition to the pending motion for summary judgment, and Wood Group does not dispute that it is BEEOO's independent contractor,[189] although certain Plaintiffs argue that Wood Group contracted only with BEE, rather than BEEOO. GIS, however, contends that it was not an independent contractor of BEEOO because GIS was working on West Delta 32 pursuant to the Alliance Agreement, not an MSA.[190] At oral argument, however, BEEOO argued that the Alliance Agreement did not supercede the MSA, and the MSA remained in play.

On August 21, 2014, BEEOO filed a motion for summary judgment covering much of the same ground in its prior motions for summary judgment, concerning whether the Alliance Agreement superseded the MSA and whether BEEOO (rather than BEE) was a party to the MSA with GIS.[191] On September 17, 2014, this Court denied the motion without prejudice to allow for discovery, and ordered that should BEEOO refile the motion, it should address the applicability of any theories of preclusion, and ordered both parties to address why the Alliance Agreement had not been disclosed earlier.[192] The Court is reluctant now to decide as a preliminary matter, based on

---

[188] Rec. Doc. 360 at p. 1.

[189] *See* Rec. Doc. 421-3 at p. 2.

[190] Rec. Doc. 424 at p. 7.

[191] *See* Rec. Doc. 403-1.

[192] Rec. Doc. 465.

motions filed before its September 17, 2014 order, the question of whether GIS was in an independent contractor relationship with BEEOO. Because the Court finds that summary judgment should be denied for other reasons, it need not address this preliminary matter.

## B.    *The Independent Contractor Defense*

Presuming that GIS, Shamrock, and Wood Group were all in fact independent contractors of BEEOO on November 16, 2012, the Court must next determine whether BEEOO can be held liable for the alleged acts or omissions of its independent contractors. Since the accident occurred on a fixed platform in the Gulf of Mexico off the coast of Louisiana, 43 U.S.C. § 1333 requires this Court to apply Louisiana substantive law. Under the Outer Continental Shelf Lands Act ("OCSLA"), the law of the adjacent state applies unless the principles of the applicable state law conflict with any federal law.[193] Neither party has cited, nor has the Court found, any conflict between federal law and the applicable Louisiana law. Therefore, the Court will apply Louisiana law to this dispute.

It is well-established under Louisiana law that "[a] principal is not liable for the torts of an independent contractor unless the principal exercises operational control over or expressly or impliedly authorizes the independent contractor's actions."[194] The Fifth Circuit has explained the "operational control" test as follows:

> In order for [a principal] to be liable for the actions of an independent contractor, the [principal] must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations. Such a general right is usually reserved to employers, but this does not mean that the contractor is controlled as to his methods

---

[193] 43 U.S.C. § 1333(a)(2)(A); *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 358 (1969).

[194] *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989) (citations omitted).

of work, or as to operative detail. There must be such a retention of right of supervision that the contractor is not entirely free to do the work in his own way.[195]

 In short, absent an express or implied order to the contractor to engage in an unsafe work practice leading to an injury, a principal . . . cannot be liable under the operational control exception."[196]

The principal/independent contractor relationship is determined, in large measure, by the terms of any contract between the parties.[197] The Fifth Circuit has determined that a principal does not retain control over its independent contractor "[w]hen the contract assigns the independent contractor responsibility for its own activities."[198] "To determine whether the exception for operational control makes a principal liable, [courts] first examine the extent to which [the principal] contractually reserved the right to control the work."[199]

In this case, as stated above, the MSAs at issue establish that BEEOO engaged Wood Group, Shamrock, and, arguably, GIS as independent contractors. The MSAs provide that  BEEOO "shall have no direction or control of the details of the Work, the CONTRACTOR, or its employees and agents except in the results to be obtained."[200] The Wood Group and Shamrock MSAs additionally

---

[195] *Id.* (citation omitted).

[196] *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997).

[197] *Ham v. Pennzoil Co.*, 869 F.2d 840, 842 (5th Cir. 1989).

[198] *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003) (citations omitted) (applying Louisiana negligence law as surrogate federal law pursuant to OCSLA).

[199] *Id.*

[200] Rec. Doc. 360-4 at p. 5, § 9.1, stating as follows:

IX. INDEPENDENT CONTRACTOR RELATIONSHIP
CONTRACTOR shall be an independent contractor with respect to the performance of all Work hereunder and neither CONTRACTOR nor anyone employed by CONTRACTOR shall be deemed for any purpose to be the employee, agent, servant, or representative of BLACK ELK in the performance of any Work or any part thereof pursuant to this Agreement. BLACK ELK shall have no direction or control of the details of the Work, the CONTRACTOR, or its employees and agents except in the results to be obtained. The actual performance and supervising of all Work hereunder shall be by CONTRACTOR, but BLACK ELK or its representatives shall have unlimited access to the premises to determine whether Work is being performed by

stated that "[i]f contractor fails to make such inspection or fails to report such a defect to Black Elk, Contractor shall be deemed to have assumed all risk and liability for any mishap that may occur by reason of such defects in such equipment, machinery, tools, or other items."[201] The MSAs additionally provide that the contractor is "responsible for initiating, maintaining, and supervising all necessary safety precautions and programs in connection with the Work" and that the contractor "shall take all necessary precautions for the safety of its employees, subcontractors, agents and invitees at the work site."[202] The Court finds, accordingly, that BEEOO did not contractually reserve the right to control the work at issue.

However, "the terms of a contract, while relevant, do not necessarily determine the outcome" of the operational control inquiry.[203] At this juncture, the Court must look beyond the contract to

---

CONTRACTOR in accordance with all of the provisions of this Agreement. At BLACK ELK's discretion, the Work may be reviewed or tested by a BLACK ELK representative and be subject to his approval and acceptance.

[201] *See* Rec. Doc. 270-4 at pp. 26, 57.

[202] Rec. Doc. 360-4 at pp. 2–3, § 5.3, stating as follows:

V. PERFORMANCE OF WORK
CONTRACTOR is responsible for initiating, maintaining, and supervising all necessary safety precautions and programs in connection with the Work. CONTRACTOR shall take all necessary precautions for the safety of its employees, subcontractors, agents and invitees at the work site. CONTRACTOR shall comply and cause its employees, subcontractors, agents and invitees entering on BLACK ELK property in the performance of the Work, or in connection therewith, to comply with all BLACK ELK safety rules that may be disclosed or known to CONTRACTOR and applicable provisions of federal, state or local safety laws, rules, or regulations to prevent damage or injury to any and all other items furnished by BLACK ELK that are employed in CONTRACTOR's Work. If apparent defects are found therein sufficient to make the use of any such items unsuitable or unsafe, CONTRACTOR shall immediately notify BLACK ELK of such defect or defects in writing and shall stop the portion of the Work affected by such defect or defects until further notification by BLACK ELK.

[203] *Morgan v. Hercules Drilling Co., LLC*, No. 09-2091, 2011 WL 2793229, at *3 (W.D. La. July 13, 2011) (citing *Dixon v. Danos and Curole Marine Contractors, Inc.*, No. 97-2611, 1998 WL 812393, at *2 (E.D. La. 1998) (J. Vance)).

33

determine whether the principal's actions constitute operational control.[204] As stated above, the operational control exception may apply where the principal gives an "express or implied order to the contractor to engage in an unsafe work practice leading to an injury."[205] The Fifth Circuit has instructed that operational control only arises if the principal exercises direct supervision over the step-by-step process of accomplishing the work, such that the independent contractor is not entirely free to do the work in his or her own way.[206] District courts within this Circuit have found that evidence of a principal giving direction on how to perform a project sufficiently raises a question of fact about operational control.[207]

Here, the consolidated Plaintiffs have proffered sufficient evidence demonstrating a genuine issue of material fact with respect to whether BEEOO provided step-by-step or "how to" instructions with respect to the LACT upgrade project. Specifically, Plaintiffs assert that BEEOO's construction supervisor, Monte Richard, has testified that he gave Compass employees Don Moss and George Wolfe specific instructions with respect to the LACT upgrade.[208] Furthermore, Plaintiffs rely on an e-mail dated November 16, 2012 at 4:21 p.m. to Doug Fehr, wherein Richard states that:

---

[204] *Dixon*, 1998 WL 812393, at *2 (citing *Duplantis v. Shell Offshore, Inc*., 948 F.2d 187, 193 (5th Cir. 1991) (reviewing the actual control asserted by Shell employees over the independent contractor in addition to the contract itself)).

[205] *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997).

[206] *Grammer v. Patterson Servs., Inc,*, 860 F.2d 639, 645 (5th Cir. 1998) (citing *Guillory v. Conoco, Inc.*, 521 So.3d 1220, 1223 (La. Ct. App. 3d Cir. 1988)); *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003); *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir. 1992).

[207] *See, e.g., Ballew v. Texaco, Inc.*, No. 94-3946, 1995 WL 638595, at *2 (E.D. La. Oct. 27, 1995) (finding a plaintiff's affidavit created a genuine issue of fact where the plaintiff stated that, every morning, he attended a safety meeting at which a company man gave directions regarding safety conditions and where the plaintiff understood he was to follow the company man's orders); *Williams Field Servs. Gulf Coast, L.P. v. Mariner Energy, Inc.*, No. 06-03846, 2011 WL 4372710, at *4 (S.D. Tex. Sept. 19, 2011) (finding a fact question concerning whether employees of the principal were issuing orders that rose to the level of operational control); *see also Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 329–30 (5th Cir. 1987) (finding operational control where a company man instructed the crew against cleaning the rig floor, a condition which directly caused the plaintiff's accident).

[208] *See* Rec. Doc. 410-2 at pp. 10–11.

Prior to the WD 32 LACT project, I spoke to the Inspector [sic] Don Moss and George Wolf [sic] and went over the scope of adding the divert valve and piping to the LACT unit, after completing the float cell project. We discussed isolating the LACT unit piping, assuring it was de-pressurized and drained of fluids, removing the outlet spool, installing the spool piece that included the divert valve and isolating the bad oil line that passes in the overhead pipe rack going to the bad oil tank, shutting all inlets into the line and shutting a valve at the tank or install [sic] a skillet in it, then draining the line of all liquids. Then using the piping that was to run from the divert vale [sic] to the bad oil line to determine where the line would need to be cold cut. Once safe to do so the line would be cold cut, vented plumbers plugs would be installed in each end of the pipe, vent lines from the plumbers plugs run to a safe area and using a gas detector make sure area [sic] is safe to weld. Slip on flanges would then be welded onto the ends of the pipe. Once the welding completed [sic] the plumbers plugs to be removed, and the spool installed and all flanges properly tightened. Once installed the isolation points opened and the line returned to service.[209]

Additionally, Plaintiffs have proffered evidence that BEEOO initiated "hot work" on the LACT unit in February 2012, but that Troy Durkes, BEEOO's Operations Supervisor, decided to shut down the project "due to lack of authorization and to allow for the re-design of the project to eliminate field welds."[210] In an e-mail sent on February 20, 2012 to Huey Cognevich, Kirk Trascher, Richard, and Heith Gaspard,  Durkes states that "[w]e are stopping the job at WD32 from going into the construction phase and we are sending the crew back in. The primary reason for this is that we have no approved drawings from BSEE allowing us to perform the work."[211] On November 2, 2012, Monte Richard e-mailed Don Moss and Bill Barlett that "Don will have LACT unit piping installed next week."[212] On November 11, 2012, Moss notified various BEEOO managers, including Richard, that "we are missing the piping and diverter valve for the lact skid upgrade job . . ."[213] On November

---

[209] Rec. Doc. 410-1.

[210] Rec. Doc. 423 at p. 2 (citing Rec. Doc. 423-2).

[211] Rec. Doc. 423-2.

[212] Rec. Doc. 423-3.

[213] Rec. Doc. 423-4.

12, 2012, Richard sent an email to Moss stating "install plumbers plugs and make the 2 field welds for the tie in."[214] Wood Group contends that these emails demonstrate that Richard made the decision that, instead of having the missing pipe re-fabricated, the construction crew would revert to the original design which required welding.[215]

As stated above, a principal's actions constitute operational control "only if the principal has direct supervision over the step-by-step process of accomplishing the work."[216] The Court finds that the pleadings, depositions, and evidence submitted in opposition to BEEOO's motions for summary judgment support the conclusion that BEEOO retained operational control over the LACT upgrade project, or at least raise a genuine issue of material fact as to such. Accordingly, BEEOO's motion for summary judgment with respect to the independent contractor defense is denied.

**C.   *Independent Negligence***

Pursuant to § 1333(2)(A) of OCSLA, Plaintiffs' negligence claim is governed by the law of the state adjacent to that portion of the seabed where they were injured—in this case, Louisiana. Here, BEEOO seeks summary judgment on alleged violations of Article 2315 and Article 2317.1.

**1.   Negligence Under Article 2315**

Pursuant to Louisiana Civil Code article 2315, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." To prove negligence under Louisiana law, a plaintiff must show that: (1) "the defendant had a duty to conform his conduct to a specific standard;" (2) "the defendant's conduct failed to conform to the appropriate standard;" (3) "the defendant's substandard conduct was a cause in fact of the plaintiff's injuries;" (4) "the

---

[214] Rec. Doc. 423-5.

[215] Rec. Doc. 423 at p. 3.

[216] *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003).

defendant's substandard conduct was a legal cause of the plaintiff's injuries;" and (5) "actual damages."[217]

Literally interpreted, a tortfeasor may be held liable under Article 2315 for any damage remotely caused by his or her fault.[218] However, "[a]s a matter of policy, the courts, under the scope of duty element of the duty-risk analysis, have established limitations on the extent of damages for which a tortfeasor is liable."[219] Under Louisiana law, determining the scope of a duty is "ultimately a question of policy as to whether the particular risk falls within the scope of the duty."[220] There "must be an 'ease of association' between the rule of conduct, the risk of injury, and the loss sought to be recovered."[221] That inquiry typically requires consideration of the facts of each case; therefore, "[a]lthough duty is a question of law, Louisiana courts do not grant summary judgment on the issue of duty where factual disputes exist or where credibility determinations are required."[222]

In deciding whether to impose a duty in a particular case, Louisiana courts examine "whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty."[223]

---

[217] *Lemann v. Essen Lange Daiquiris, Inc.*, 2005–1095 (La. 3/10/06); 923 So.2d 627.

[218] *Severn Place Assocs. v. Am. Bldg. Servs., Inc.*, 05-859 (La. App. 5 Cir. 4/11/06); 930 So.2d 125, 127.

[219] *Id.* (citations omitted).

[220] *Roberts v. Benoit*, 605 So.2d 1032, 1044 (La. 1991).

[221] *Severn*, 930 So.2d at 127 (citation omitted).

[222] *Bass v. Superior Energy Servs., Inc.*, No. 13-5175, 2015 WL 460378, at *10 (E.D. La. Feb. 3, 2015) (Brown, J.) (citing *Parish v. L.M. Daigle Oil Co., Inc.*, 98-1716 (La. App. 3 Cir. 6/23/99); 742 So.2d 18, 10–11 ("Summary judgment is proper only where no duty exists  as a matter of law and no factual or credibility disputes exist."); *Coates v. Nettles*, (La. App. 1 Cir. 1990); 563 So.2d 1257, 1259 ("Where there is no factual dispute which exists and no credibility determination required, the question of the existence of a duty is a legal question within the province of the trial judge."). *See also Robertson v. Blanchard Contractors, Inc.*, No. 11-1453, 2012 WL 6202988 (E.D. La. Dec. 12, 2012) (Brown, J) (same).

[223]  *Audler v. CBC Innovis Inc*., 519 F.3d 239, 249 (5th Cir. 2008) (citation omitted).

### a.   *Statutory Duties*

Multiple parties contend that the requirements of 30 C.F.R. § 250.1900, pertaining to safety and environmental management systems ("SEMS"), imposed a statutory duty on BEEOO to provide safe working conditions to all personnel aboard the West Delta 32.[224] Canencia Plaintiffs, for example, argue that the federal regulations, passed in the wake of the Deepwater Horizon incident, place affirmative duties on BEEOO to provide workers with a safe place to work, and BEEOO assumed those duties when it formulated and implemented its Safety Manual.[225] Canencia Plaintiffs allege that in formulating a "Safe Work Manual" pursuant to the requirements of federal regulations and requiring its contractors to follow that manual, BEEOO assumed the duty of providing for the safety of the independent contractors on its platform.[226] Canencia Plaintiffs contend that BEEOO could not contract away its safety responsibilities in light of the new federal regulations.[227] Furthermore, Dominguez and GIS argue that BEEOO's alleged violation of BSEE regulations, as well as its own Welding, Burning and Hot Tapping Safe Practices and Procedures Plan, constitutes negligence per se. BEEOO concedes that the regulations subject violators to civil and criminal penalties but maintains that they do not create any independent cause or right of action for private plaintiffs.[228] Although the regulations in question are recent, opposing parties have pointed to no case law, either in their briefs or at oral argument, holding that the SEMS regulations impose civil liability on platform owners, nor could the Court find any.

---

[224] *E.g.* Rec. Doc. 414 at p. 5.

[225] *Id.*

[226] *Id.* at p. 6 (citing Dep. of Kenneth Anthony, a former BEEOO employee, Ex. 1 at p. 29).

[227] *Id.* at p. 11.

[228] Rec. Doc. 458 at p. 7 (citing *Romero v. Mobil Exploration & Producing N. Am., Inc.*, 939 F.2d 307, 310–11 (5th Cir. 1997)).

The Fifth Circuit has rejected the idea that OCSLA regulations themselves create a duty under Louisiana negligence law.[229] In *Romero v. Mobil Exploration and Producing North America, Inc.*, the Fifth Circuit held that federal drilling regulations promulgated by the Department of the Interior Minerals Management Service ("MMS") did not give rise to liability that would otherwise be barred by the independent contractor doctrine.[230] There, the Fifth Circuit held that no cause of action arose from the breach of the MMS regulations "because the regulations were not created solely to 'provide safeguards or precautions for the safety of others.'"[231] Its name alone suggests that the SEMS regulations do not *solely* provide for the safety of others; as noted in § 250.1901, the goal of a SEMS program "is to promote safety and environmental protection by ensuring all personnel aboard a facility are complying with . . . policies and procedures . . ."

Here, Plaintiffs argue that pre-SEMS cases finding that a violation of MMS regulations did not give rise to a private cause of action "were completely obviated by the passage of new CFRs."[232] Plaintiffs attempt to distinguish as inapplicable the Fifth Circuit's decision in *Fruge ex rel. Fruge v. Parker Drilling Co.*, which held that federal regulations did not create additional civil liability beyond that already imposed by state law and rejected an argument by plaintiffs that cases decided prior to the passage of MMR regulations were inapplicable because the new regulations shifted responsibility to mineral lessees without regard to questions of "operational control" or the authorization of unsafe work practices.[233] As noted by BEEOO, however, this is essentially the same

---

[229] *Dupre v. Chevron U.S.A., Inc.*, 109 F.3d 230, 231 (5th Cir. 1997).

[230] *Romero*, 939 F.2d at p. 309.

[231] *Id.*

[232] Rec. Doc. 414 at p. 11.

[233] *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 561 (5th Cir. 2003).

argument as was made by the plaintiffs in *Fruge* itself, where the Fifth Circuit ultimately found that nothing in the new MMS regulations preempted existing state law.[234]

Here, Plaintiffs argue essentially that the SEMS regulations speak for themselves by providing specific guidance as to the responsibility ultimately to be borne by platform owners.[235] Plaintiffs have not pointed to a single case or any legislative history suggesting that the SEMS regulations legislatively overruled all prior cases holding that federal regulations do not preempt the independent contractor defense simply by creating standards regarding workplace safety. Without guidance from the Fifth Circuit or the Louisiana Supreme Court finding that the federal regulations created a private cause of action, the Court declines to find that they imposed a statutory duty upon BEEOO that may be enforced in this Court by the Consolidated Plaintiffs. The Court notes, however, that even where there is no implied cause of action from the mere breach of SEMS regulations, "Louisiana law does recognize that applicable federal regulations may be relevant evidence in weighing a defendant's culpability."[236]

> ### b.    *Legal Duties*

Consolidated Plaintiffs also allege that Black Elk had an independent legal duty of care to the workers aboard the West Delta 32 by virtue of its creation of the hazard that resulted in Plaintiffs' injuries and its failure to supervise or provide a safe place to work despite assuming control and responsibility for the operation. Plaintiffs allege that BEEOO was independently negligent because it created an unnecessary hazard when it required GIS to perform welding in the field rather than on land, rushed the LACT unit work, and failed to enforce its own safety policies

---

[234] *Id.* at p. 563.

[235] Rec. Doc. 414 at p. 11.

[236] *Romero v. Mobil Exploration & Producing N. Am., Inc.*, 939 F.2d 307, 311 (5th Cir. 1991).

through Srubar, the Person in Charge on the platform.

It is generally true that an "owner or operator of a facility has the duty of exercising reasonable care for the safety of a person on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm."[237] However, this duty does not extend so far as to require the owner or operator to intervene in and correct the work practices selected by an independent contractor.[238] Rather, "in determining whether a principal owes a duty to employees of independent contractors, courts consider whether the hazard was created by the principal or the independent contractor."[239]

The Fifth Circuit has found that when a principal has specifically authorized and created a hazardous situation by approving plans for certain work to be done, the principal had a duty to take reasonable steps to keep workers safe in the areas that had been modified with its approval.[240] In *Dupre v. Chevron U.S.A., Inc.*, the Fifth Circuit determined that Chevron, the owner of an offshore platform, had a duty to take reasonable steps to make and keep its platform safe for workers thereon because "[u]nlike the typical vicarious liability case in which the independent contractor created the danger, in this case Chevron specifically authorized any hazardous situation created when it expressly approved the plan . . . for the installation and set-up of its rig."[241] Similarly, in

---

[237] *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994) (citations omitted); *Mundy v. Dep't of Health and Human Res.*, 620 So.2d 811, 813 (La. 1993).

[238] *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 551 (5th Cir. 1987); *Kent v. Gulf States Utils.*, 418 So. 2d 493, 500 (La. 1982).

[239] *Thomas v. Burlington Res. Oil & Gas Co.*, No. 99-3904, 2000 WL 1528082, at *2 (E.D. La. Oct. 13, 2000) (Barbier, J.); *see also Dupre v. Chevron U.S.A., Inc.*, 33 F.3d 7, 7–8 (5th Cir. 1994) ("We do not reject but fully accept the general principal that a platform principal owes no general duty to an independent contractor's employees to correct a hazard on the platform *which was created by the contractor*. We are simply unwilling to say, without the benefit of development of the facts . . ., that here Chevron owed no duty or, of course, that any such duty had been breached.") (emphasis added).

[240] *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994).

[241] *Id.*

*Bartholomew v. CNG Producing Co.*, the Fifth Circuit held a principal liable for the acts of an independent contractor where the principal's representative expressly ordered the independent contractor to engage in unsafe work practices that eventually caused an injury to the plaintiff.[242]

In *Graham v. Amoco Oil Co.*, however, the plaintiffs argued, as Plaintiffs do here, that Amoco was liable for independent acts of negligence by creating an unsafe workplace.[243] The plaintiffs also argued that Amoco was independently negligent because its "company man" observed that the independent contractor used procedures in unloading pipe that violated Amoco's safety manual and failed to correct them.[244] The *Graham* court, however, rejected the argument, finding that the contractual allocation of responsibilities between the contractor and Amoco precluded a finding that Amoco was independently negligent, and that Amoco did not assume any extra-contractual duties otherwise.[245]

BEEOO argues that it owed Plaintiffs no duty to provide a safe work place, and because "whatever steps were taken to dictate the actions that led up to the explosion on November 16, 2012, they did not involve [BEEOO]."[246] BEEOO also argues that it was not negligent because it had little to no control over the operations onboard the West Delta 32, it did not rush the LACT work, that even to the extent it gave instructions for work, they were not followed by the contractors, BSEE approved of the order to allow field welds on the LACT unit, and that using the prefabricated piping as originally intended still required two welds.[247] Many of BEEOO's arguments amount to questions

---

[242] 832 F.2d 326, 329–30 (5th Cir. 1987).

[243] 21 F.3d 643, 646 (5th Cir. 1994).

[244] *Id.* at 645.

[245] *Id.* at 647.

[246] Rec. Doc. 360-1 at p. 13.

[247] Rec. Doc. 454 at p. 4.

of fact to be considered at the breach stage by a trier of fact, and do not necessarily speak to whether BEEOO created a hazardous situation out of which a duty of care could arise.

Although duty is a question of law, the Court finds that opposing parties have proffered sufficient evidence of a genuine issue of material fact that precludes summary judgment on whether BEEOO created a hazardous situation aboard the West Delta 32 and therefore was independently negligent. First, Canencia Plaintiffs have submitted evidence demonstrating that BEEOO scrapped the original plan to use field welds on the LACT unit because it was aware that there are "hazards associated with hot work on the facility."[248] Gipson and Srubar Plaintiffs have submitted evidence, in the form of testimony by Monte Richard, that BEEOO had a policy of trying to minimize offshore welding, and eliminating offshore welding on the LACT project "could have been feasible."[249] Voclain Plaintiff also points to deposition testimony by Richard stating that, although GIS had offered to fabricate something that could eliminate all of the field welds, Richard gave the instruction to nevertheless employ a procedure that required field welds.[250] Citing an e-mail by Richard, BEEOO responds that the LACT work would have required at least two field welds no matter which plan was used.[251] Richard's own conflicting testimony, however, at the very least displays a disputed issue of material fact concerning whether BEEOO approved of a hazardous work plan when a safer one was available.

Disputed issues of material fact also surround the question of whether BEEOO put time pressures on the workers aboard the West Delta 32. BEEOO points to testimony by Moss and

---

[248] *See* Rec. Doc. 415-19 at p. 1;  Rec. Doc. 415-1 at pp. 73-74; Rec. Doc. 415-4 at pp. 262-65.

[249] Rec. Doc. 409-5 at pp. 370–72.

[250] Rec. Doc. 414-4 at pp. 198–99.

[251] Rec. Doc. 454 at pp. 5–6 (citing Rec. Doc. 420-8).

Richard stating that the West Delta 32 could not come online until Energy XXI's West Delta 30E platform returned online, and that therefore the men knew that there was no rush to complete the LACT unit work.[252] Canencia Plaintiffs, however, have submitted evidence that on November 12, 2012, Monte Richard sent an e-mail to Brian Richard and Kory Delcambre of GIS, as well as Moss, stating that the piping that had gone missing needed to be found "asap."[253] Moss later testified that when he received that e-mail, he understood that BEEOO had given the contractors time constraints to finish the job on November 16, 2012.[254] Therefore, Plaintiffs have raised a disputed issue of material fact concerning whether BEEOO rushed its contractors to complete the LACT work and thereby created a hazardous situation.

"Although duty is a question of law, Louisiana courts do not grant summary judgment on the issue of duty where factual disputes exist or where credibility determinations are required."[255] Where, as here, the Court cannot determine an issue of law without determining the credibility of witnesses or deciding a disputed issue of material fact, summary judgment on the question of whether BEEOO had an independent legal duty to provide safe working conditions is precluded. Finally, the Court notes that the parties continue to dispute whether all aboard the West Delta 32 were independent contractors. BEEOO argues that all aboard the West Delta 32 were independent contractors or employed by independent contractors, and the Court here denies summary judgment

---

[252] Rec. Doc. 454 at p. 6 (citing Rec. Doc. 415-2 at pp. 86–88, 217–18).

[253] Rec. Doc. 415-17.

[254] Rec. Doc. 415-2 at p. 371.

[255] *Bass v. Superior Energy Servs., Inc.*, No. 13-5175, 2015 WL 460378, at *10 (E.D. La. Feb. 3, 2015) (Brown, J.) (citing *Parish v. L.M. Daigle Oil Co., Inc.*, 98-1716 (La. App. 3 Cir. 6/23/99); 742 So.2d 18, 10–11 ("Summary judgment is proper only where no duty exists  as a matter of law and no factual or credibility disputes exist."); *Coates v. Nettles*, (La. App. 1 Cir. 1990); 563 So.2d 1257, 1259 ("Where there is no factual dispute which exists and no credibility determination required, the question of the existence of a duty is a legal question within the province of the trial judge."). *See also Robertson v. Blanchard Contractors, Inc.*, No. 11-1453, 2012 WL 6202988 (E.D. La. Dec. 12, 2012) (Brown, J) (same).

because, as a matter of law, it cannot determine whether BEEOO owed its contractors a duty without making factual and credibility determinations that are best left to a fact-finder—here, the jury. However, the Court notes that its analysis concerning the duty element would be different if it examined the question as applied to parties who are not independent contractors, an issue that BEEOO alluded to in a footnote but did not brief.[256] Because BEEOO's motion for summary judgment rested so heavily on arguments concerning independent contractors, the Court need not address the duty element as applied to parties whose relationships to BEEOO were not governed by an MSA at this time.

### 2.    Liability Under Article 2317.1

To prevail on a custodial liability claim, a plaintiff must demonstrate: (1) the object was in the defendant's custody, (2) the thing contained a vice or defect which presented an unreasonable risk of harm to others; (3) the defective conditions caused the damage; (4) the defendant knew or should have known of the defect (5) the damage could have been prevented by the exercise of reasonable care, and (6) the defendant failed to exercise such reasonable care.[257]

BEEOO argues that it is not negligent under Louisiana Civil Code Article 2317.1 because the WD-32 platform was not in BEEOO's custody on November 16, 2012, the platform and its equipment were not defective, and BEEOO had no knowledge of the alleged defect.[258]

### a.    Custody

BEEOO admits that it owns the WD-32 platform, but argues that the platform was not in

---

[256] Rec. Doc. 270-1 at p. 3 n.11 ("This factor [concerning parties who were not subject to MSAs with BEEOO] may change the analysis, but it should not change the result.").

[257] *Cormier v. Dolgencorp, Inc.*, 136 F. App'x 627, 628 (5th Cir. 2005).

[258]  Rec. Doc. 360-1.

BEEOO's custody at the time of the incident because BEEOO had no employees or personnel aboard.[259] According to BEEOO, "[c]ustody, distinct from ownership, refers to a person's supervision and control (garde) over a thing posing an unreasonable risk of harm."[260] BEEOO relies on a case from another Section of this court, wherein the court found that a platform owner was not liable under Article 2317.1 because it did not exercise the kind of supervision and control necessary to establish custody.[261] Citing *Bethea v. Great Atlantic & Pacific Tea Co.*, Canencia Plaintiffs respond that an owner cedes custody or garde when it has a limited ability to inspect or enter the premises and an inability to alter the premises.[262] Here, they argue, BEEOO had unlimited access to enter the platform, and at least once daily, a BEEOO supervisor would inspect the platform personally or contact a platform operator "and communicate as to what was going on."[263]

"'Custody,' for purposes of strict liability, does not depend upon ownership, but involves the right of supervision, direction, and control as well as the right to benefit from the thing controlled."[264] Here, the question of whether BEEOO retained a right to supervise, direct and control activities aboard the West Delta 32 is heavily disputed; it is, in fact, at the very heart of BEEOO's independent contractor defense. In *Hammons v. Forest Oil Corp.*, cited by BEEOO, the court granted summary judgment on the issue of custodial liability after noting that the plaintiff had

---

[259] *Id.* at p. 19.

[260] *Id.* at p. 20 (quoting *Pierce v. Exxon Mobil Corp.*, No. 12-2224, 2013 WL 1856079, at *6 (E.D. La. Apr. 30, 2013).

[261] *Id.* at pp. 20–21 (citing *Hammons v. Forest Oil Corp.*, No. 06-9173, 2008 WL 348765, at *4 (E.D. La. Feb. 7, 2008) (Africk, J.)).

[262] Rec. Doc. 415 at p. 17 (citing *Bethea v. Great Atlantic & Pacific Tea Co.*, 2007-1385 (La. App. 4 Cir. 9/30/99); 22 So.3d 1114, 1115).

[263] *Id.*

[264] *Haydel v. Hercules Transp., Inc.*, 94-0016 (La. App. 1 Cir. 4/7/95), 654 So. 2d 408, 414, *writ denied*, 95-1171 (La. 6/23/95), 656 So. 2d 1018.

already conceded that the defendant had not exercised operational control over the activities in question.[265] Here, however, opposing parties have argued vehemently that BEEOO retained operational control—and thus, in essence, that it had not ceded custody of the West Delta 32 platform. Therefore, the Court finds that there is a disputed issue of material fact that precludes summary judgment on the question of whether BEEOO retained custody of the West Delta 32.

### b. Defect

Next, BEEOO argues that its platform, piping, and tanks were not defective under Article 2317.1.[266] BEEOO contends that the purpose of tanks and piping on a production platform is to hold and move hydrocarbons, and "[t]hus, the fact that there were allegedly hydrocarbons in piping or tank aboard an oil and gas platform does not constitute a defect or unreasonably hazardous condition as contemplated by Article 2317.1."[267] Moreover, BEEOO argues that "not every defect gives rise to liability. The defect must be of such a nature to constitute a dangerous condition, which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances."[268] BEEOO argues that, in light of the undisputed fact that the platform had been shut in at the time of the explosion, the explosion was caused by one or more parties on the platform not exercising "ordinary care under the circumstances."[269] Tajonera and Corporal Plaintiffs, who engage with the arguments concerning liability under 2317.1 in greater detail than most opposing parties, do not directly respond to the question of whether the platform, piping and tanks aboard the West

---

[265] *Hammons,* 2008 WL 348765, at *4.

[266] Rec. Doc. 360 at pp. 20–21.

[267] *Id.* at pp. 21–22.

[268] *Id.* at p. 22 (quoting *Ruschel v. St. Amant*, 11-78 (La. App. 5 Cir. 5/24/11); 66 So. 3d 1149, 1153).

[269] *Id.*

Delta 32 were defective. Instead, they argue that the question of whether a defect presents an unreasonable risk of harm requires a balancing of the risk and utility of the condition.[270]

"A defect for the purposes of article 2317 is a flaw or condition of relative permanence inherent in the thing as one of its qualities."[271] Thus, "[a] temporary condition may constitute a hazard, but it does not constitute a defect as contemplated by article 2317."[272] Here, Consolidated Plaintiffs do not appear to argue that the alleged defect in question was anything other than the condition of the pipes, which had not been purged of flammable fluid at the time of welding work aboard the West Delta 32. Louisiana courts, however, have repeatedly found that such temporary conditions do not amount to a "defect" as contemplated by Article 2317.[273] Here, the fluid inside the pipes was a temporary condition meant to be purged before welding work would begin. Although the failure to do so may constitute negligence, the Court finds that the fluid's temporary presence inside the pipes aboard the West Delta 32 do not amount to a defect as contemplated by Article 2317.

Because the Court finds that summary judgment on the issue of liability under Article 2317 is appropriate because Consolidated Plaintiffs have failed to sufficiently allege a "defect," the Court

---

[270] Rec. Doc. 435 at p. 21.

[271] *Duffy v. Conoco, Inc.*, No. 95-0600, 1996 WL 271635, at *6 (E.D. La. May 21, 1996) (Vance, J.) (citing *Murry v. Alan Energy Corp.*, 863 F. Supp. 315, 319 (E.D. La. 1994); *Crane v. Exxon Corp., U.S.A.*, 613 So. 2d 214, 219 (La. App. 1st Cir. 1992)).

[272] *Dauzat v. Thompson Const. Co.*, 02-989 (La. App. 5 Cir. 1/28/03), 839 So. 2d 319, 323 (La. Ct. App. 2003) (citing *Barron v. Webb*, 29,707 (La. App. 2 Cir. 8/20/97), 698 So. 2d 727, *writ denied*, 97,2357 (La. 11/26/97), 703 So. 2d 651).

[273] *See Hammons v. Forest Oil Corp.*, No. 06-9173, 2008 WL 348765, at *4 (E.D. La. Feb. 7, 2008); *Dauzat*, 839 So. 2d at 323 (finding that a hole in a concrete slab, into which an electrical lift fell, causing the plaintiff on the lift to lurch forward, was a temporary condition that did not constitute a defect); *Crane*, 613 So. 2d at 219 (finding that an open chute in a concrete slab was a temporary condition designed to be filled and then covered, and therefore was not a defect).

need not address the question of whether BEEOO had actual or constructive knowledge of the defect.

## V. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that BEEOO's "Motion for Partial Summary Judgment"[274] is **DENIED.**

**IT IS FURTHER ORDERED** that BEEOO's "Motion for Summary Judgment"[275] is **GRANTED IN PART** and **DENIED IN PART.** The motion is **GRANTED** insofar as it seeks summary judgment on the issue of whether BEEOO is subject to liability under Article 2317. The motion is **DENIED** as to all other parts.

**NEW ORLEANS, LOUISIANA**, this ___4th____ day of November, 2015.

**NANNETTE JOLIVETTE BROWN
UNITED STATES DISTRICT JUDGE**

---

[274] Rec. Doc. 270.

[275] Rec. Doc. 360.

49