**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **EDNA TAJONERA, et al.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 13-0366**<br> **c/w 13-0550, 13-5137, 13-2496,**<br>**13-5508, 13-6413, 14-374, and**<br>**14-1714** |
| **BLACK ELK ENERGY OFFSHORE OPERATIONS,**<br>**L.L.C., et al.** | **SECTION: "G"(5)** |

## ORDER

Before the Court are Grand Isle Shipyard, Inc.'s ("GIS") "Motion to Exclude Testimony of Brian Sut[t]erlin"[1] and Tajonera and Corporal Plaintiffs' "Motion to Exclude Testimony of Brian Sut[t]erlin,"[2] seeking to exclude a portion of the expert report on the grounds that this portion and the opinions expressed therein are unreliable and not based on any objective standard, rule, or regulation.[3] Having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court will deny the motion.

## I. Background

This litigation arises out of an explosion that occurred on November 16, 2012 on the Black Elk Energy West Delta 32 Block Platform ("West Delta 32"), located in the Gulf of Mexico approximately 17 miles southeast of Grand Isle, Louisiana. The explosion killed three men and injured many more.

---

[1] Rec. Doc. 511. Although GIS's motion repeatedly refers to the expert at issue as "Brian Sutherlin," he is named as Brian Sutterlin in various other documents, including in his deposition, and therefore the Court herein refers to him as Sutterlin.

[2] Rec. Doc. 514.

[3] Rec. Doc. 662-1 at 1.

On October 14, 2014, GIS filed the instant motion seeking to exclude the testimony of Brian Sutterlin, a non-retained expert seeking to testify on behalf of Black Elk Energy Offshore Operations, LLC ("BEEOO").[4] Also on October 14, 2014, Tajonera and Corporal Plaintiffs filed a motion adopting by reference the arguments contained in GIS's motion.[5] BEEOO filed an opposition on October 21, 2014,[6] to which GIS filed a reply on October 29, 2014.[7] Oral argument was held on the motion on October 29, 2014.[8]

## II. Parties' Arguments

### A.    *GIS's Arguments in Support of Motion to Exclude Testimony of Brian Sutterlin*[9]

GIS asserts that Sutterlin, a non-retained expert pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), is an electrical engineer employed by Mine Safety Appliances ("MSA"), the manufacturer of Orion Gas Detectors.[10] According to GIS, BEEOO seeks to present testimony from Sutterlin based on his participation in or knowledge of the testing mandated by the Bureau of Safety and Environmental Enforcement ("BSEE") of GIS's gas detectors, which were recovered after the November 16, 2012 explosion.[11] GIS claims that BEEOO will use Sutterlin to testify as to the methods and procedures used by MSA to test the gas detectors, as well as the data recovered

---

[4] Rec. Doc. 511.

[5] Rec. Doc. 514.

[6] Rec. Doc. 528.

[7] Rec. Doc. 556.

[8] Rec. Doc. 553.

[9] Although Tajonera and Corporal Plaintiffs have adopted the arguments made in GIS's motion, for the sake of brevity, the Court will refer to the motion as one filed by GIS.

[10] Rec. Doc. 511-2 at 3.

[11] *Id.*

from them, including the fact that the gas detectors were not activated on November 16, 2012.[12]

As background, GIS explains that after the November 16, 2012 explosion, Sutterlin's employer, MSA, was contacted by representatives of BSEE and asked to extract data from two Orion gas detectors that GIS had brought to the platform.[13] According to GIS, the gas detectors typically store peak readings of gas, the average readings, temperatures, and any events, such as being turned on and off and calibrations.[14] GIS asserts that MSA agreed to download this data and received the detectors on January 9, 2013.[15] GIS claims that Sutterlin has testified that the two gas detectors remained in sealed boxes until they were opened in the presence of a BSEE investigator and a BEEOO investigator, ABS, on April 4. 2013.[16] According to GIS, MSA attempted to download data from the gas detectors, but was unable to do so because neither detector would stay on.[17] GIS argues that no one attempted to photograph or videotape what was done to the detectors "outside the presence of the parties to this lawsuit," but Sutterlin noted that there was damage externally and internally to both detectors.[18] GIS avers that it was decided that the data logged by the two detectors could not be downloaded using conventional means, and therefore MSA would write a computer program to extract data directly form a chip inside the detectors.[19] GIS asserts

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.* at 4.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

that Scott Pavetti ("Pavetti"), an employee of MSA, modified an existing software program to extract the data.[20] However, GIS argues that the method of data extracted has not been validated or peer reviewed, and the data retrieved is unreliable.[21]

GIS contends that Sutterlin is not qualified as a non-retained expert, as he is an electrical engineer, not a software developer, which is the cornerstone of his opinions.[22] GIS argues that although Sutterlin was the team leader for MSA, he did not write the program used to extract the data, and cannot testify as to its specifics.[23] According to GIS, Sutterlin testified that Pavetti would be the best person to testify regarding the "inner workings of the software program," and that he could not specifically attest to the variations made between the Solaris and Orion programs.[24] GIS avers that because Sutterlin is offering opinions based solely on the data extracted as a result of the application of the software program written by Pavetti, he should not be allowed to testify as an expert.[25] Furthermore, GIS argues, because BEEOO seeks to offer Sutterlin's testimony via deposition instead of bringing him live to trial, BEEOO has failed to provide the Court with sufficient information during the deposition regarding Sutterlin's education, training, and experience, or other information from which to evaluate his qualifications to offer testimony regarding data extraction.[26]

---

[20] *Id.*

[21] *Id.* at 5.

[22] *Id.* at 8.

[23] *Id.*

[24] *Id.* at 9–10.

[25] *Id.* at 10.

[26] *Id.* (citing *Harang v. Schwartz*, 2014 U.S. Dist. LEXIS 113675, at *28–30 (E.D. La. Aug. 15, 2014)).

Next, GIS avers that the proprietary software used to extract data from the chips has not been subjected to peer review and publication, as it was developed solely to use in connection with the investigation in this case, nor has it been sufficiently tested to ensure its validity.[27] GIS claims that MSA only attempted to verify the software by testing it on three gas detectors it had in its office, and the specific software used in the investigation is not available to anyone.[28] GIS contends that it requested from MSA the verification data from the three exemplar gas detectors and received 67 pages of documentation, but it was unlike the documentation produced in connection with the two gas detectors involved herein and there was no way to compare the data downloaded conventionally using the commercially available software and the data obtained by use of the specially written program.[29] According to GIS, even the program from which the modified program was produced has only been used between two and five times to extract data that could not be conventionally obtained, and therefore the software used in this case has not been adequately validated to allow it to form the basis of Sutterlin's testimony.[30]

GIS also argues that the data extracted is so flawed that it cannot meet any reasonable reliability standard.[31] For example, GIS argues that although Sutterlin testified unequivocally that from the time the gas detectors were received by MSA, they remained sealed in their boxes until they were opened in April 2013, the data extracted from the detectors shows that one of the detectors was activated on March 5, 2013, two months after the detectors were received from

---

[27] *Id.* at 11.

[28] *Id.*

[29] *Id.*

[30] *Id.* at 11–12.

[31] *Id.* at 12.

BSEE by MSA, and one month before they were taken out of their sealed boxes to be inspected.[32] GIS argues that, if the gas detector is not turned on, it cannot record data, and therefore there is no explanation for the entries on March 5, 2013, other than incorrect data extraction.[33] GIS argues that, because Sutterlin could not explain in his deposition how gas detectors sealed in boxes could be activated and record data, the Court should conclude that the data extraction is simply not accurate or reliable and therefore Sutterlin's testimony should be excluded.[34]

In addition, GIS contends that the surrounding circumstances in the data strongly suggest that the software program used by MSA to extract data from the chip did not extract all of it.[35] Specifically, GIS claims that the event logs for each detector should show each time the gas detector is turned on.[36] However, GIS asserts, the event logs and data logs in this case are inconsistent, as the data logs show that the 2006 Unit was in use on November 7 and 8, 2012 for an extended period of time on both dates, but the event log does not show any entries whatsoever for either day.[37] GIS argues that there can be no explanation for the absence of event log entries showing, at a minimum, the detectors being turned on and off on November 7 and 8, 2012, when there are substantial data readings for both dates, unless the software program failed to extract all of the data from the chip.[38] Therefore, GIS avers, there is no way the Court can be certain that the

---

[32] *Id.* at 13.

[33] *Id.* at 14.

[34] *Id.* at 14–15.

[35] *Id.* at 15.

[36] *Id.*

[37] *Id.*

[38] *Id.*

untested software program did not also fail to extract data for November 15 and 16, 2012, and this undeniable error in the data extraction should caution the Court against permitting the uncorroborated evidence and testimony to be put before the jury.[39]

GIS further avers that the opinion regarding whether the gas detectors were used on either November 15 or 16 is flawed because Sutterlin admits that he cannot "cross-corroborate" the data.[40] According to GIS, the date and time on a gas detector can be manually set by the user.[41] GIS contends that Sutterlin has conceded that if the date and time stamp was set incorrectly, the date and time recorded will be inaccurate, and although he believes that the data extracted actually reflects the data recorded, he has no way to verify the accuracy of the recorded data.[42] Therefore, GIS argues, Sutterlin should be precluded from offering testimony or presenting evidence, especially in light of testimony from several D&R Resources, LLC ("D&R") employee eyewitnesses who stated that the gas detectors were being used at the time of the incident.[43]

Next, GIS asserts that, as a non-retained expert, Sutterlin's testimony should be limited to his activities in connection with BSEE's investigation, as Federal Rule of Civil Procedure 26(a)(2)(C) requires that his testimony encompass only those facts made known to him during the course of his work for BSEE.[44] GIS avers that testimony regarding such issues as how a gas detector works, how a gas detector is calibrated, what is a bump test and whether MSA

---

[39] *Id.*

[40] *Id.* at 16.

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

recommends it, and any alleged problems with the gas detector are all beyond the scope of MSA's work for BSEE and moves Sutterlin into the realm of experts from whom a report and full disclosure was required.[45] Finally, GIS argues that to the extent the Court does not exclude all of Sutterlin's testimony, the Court should hold a full *Daubert* hearing regarding Sutterlin's qualifications and ability to testify about the software program used to extract data, the peer review and validity testing of the software program, and the errors in data extraction.[46]

## B.  *BEEOO's Arguments in Opposition to Motion to Exclude Brian Sutterlin*

In opposition, BEEOO argues that although it listed Sutterlin as a "non-retained expert witness" in order to avoid any objections, in fact, Sutterlin does not plan to offer any expert opinions at trial, and is merely a "lay expert, fact witness."[47] According to BEEOO, Sutterlin will testify about what his team did in response to the inquiries of BSEE to inspect the GIS gas detectors, extract its data, and inform BSEE of certain facts based on that data.[48]

As background, BEEOO explains that users of the Orion gas detectors, including GIS, can extract data from the detectors by connecting them to a computer and using MSA's proprietary software.[49] However, BEEOO avers, MSA will occasionally be called upon to provide assistance and expertise to repair or retrieve data from an MSA gas detector when conventional methods are unsuccessful.[50] BEEOO asserts that, in November 2012, GIS brought two Orion detectors, the

---

[45] *Id.* at 17.

[46] *Id.*

[47] Rec. Doc. 528 at 2.

[48] *Id.*

[49] *Id.* at 3.

[50] *Id.*

"2008 Unit" and the "2006 Unit," to the West Delta 32. According to BEEOO, the 2006 Unit was calibrated onshore on November 2, 2012, and the 2008 Unit was calibrated on November 7, 2012, which presumably included ensuring that the units used the correct time and date.[51]

BEEOO avers that, because they are portable, the Orion gas detectors were powered by batteries that required regular charging, and on November 16, 2012, GIS was charging its gas detectors in the gauger's shack on the E platform, where they were eventually found after the explosion.[52] According to BEEOO, it also owned gas detectors on the West Delta 32, but there is no evidence that they ever left the office of Danny Gipson, employed by Wood Group PSN, Inc.[53] BEEOO asserts that although GIS makes arguments to the contrary, it has never presented evidence to explain how both of its detectors ended up in the gauger's shack if they were being used by Ellroy Corporal and another fire watch, as GIS claims.[54]

As further background, BEEOO explains that after the explosion, BSEE and the U.S. Coast Guard conducted an extensive investigation, in which BSEE approached MSA to ask about extracting data from the two Orion detectors.[55] According to BEEOO, Sutterlin was tasked with leading the MSA inspection team, whose work was provided to BSEE at no cost simply for the purpose of assisting the government in its investigation.[56] BEEOO avers that on November 4, 2013, BSEE issued a report stating that several GIS and D&R employees stated that the two GIS-

---

[51] *Id.* at 3–4.

[52] *Id.* at 4.

[53] *Id.* at 4–5.

[54] *Id.* at 6–7.

[55] *Id.* at 7.

[56] *Id.*

issued gas detectors were not functioning properly, as one constantly alarmed and the other could not hold a charge for very long.[57] According to BEEOO, Curtis Danton told BSEE that the gas detectors worked adequately, but the agency did not find his statements credible, and according to the data extracted, they were not even turned on during November 15 or 16, 2012.[58]

Next, BEEOO alleges that on April 4, 2013, MSA tried to begin testing the GIS gas detectors by conventional methods, but it could not do so because the 2006 Unit was in constant alarm and the 2008 Unit would not stay powered on.[59] Therefore, BEEOO claims, MSA was forced to develop an alternative method of extracting the data.[60] According to BEEOO, MSA had to slightly modify its current software to decipher the raw data to be extracted, a task that was assigned to software engineer Pavetti.[61] BEEOO avers that in order to verify the new data extraction method and software was reliable and accurate, MSA first tested it on three exemplar Orion gas detectors of the same type, which confirmed the veracity of the data and the ability of the new software to synthesize data.[62] BEEOO asserts that on August 27 and 28, 2013, in the presence of BSEE, BEEOO's investigator, and GIS, Sutterlin and his team began to extract data from the units, which Sutterlin ultimately interpreted.[63] According to BEEOO, Sutterlin told BSEE that there were no readings or events logged on the 2006 or 2008 Units for November 15 or 16,

---

[57] *Id.*

[58] *Id.* at 7–8.

[59] *Id.* at 8

[60] *Id.* at 8–9.

[61] *Id.* at 9.

[62] *Id.*

[63] *Id.*

2012, meaning that they had not been turned on.[64] BEEOO claims that Sutterlin explained these findings at his deposition, and therefore the only arguable opinion he offered was regarding his confidence in the reliability of MSA's work and the veracity of the data extracted.[65]

BEEOO argues that, as Sutterlin is a non-retained expert, Rule 26(a)(2)(C) required only that BEEOO provide a disclosure stating the subject matter on which Sutterlin would present evidence under Federal Rule of Evidence 702, 703, or 705, and a summary of the facts and opinions to which he would testify.[66] Therefore, BEEOO avers, because Sutterlin was not specially retained by BEEOO for the purposes of this litigation, he is exempt from the Rule 26(a)(2)(B) reporting requirement insofar as his testimony relates to his observations and opinions during the investigation and testing of the GIS gas detectors.[67] BEEOO contends that, therefore, the question of whether Sutterlin's testimony should be excluded at trial will depend in large part on the nature and scope of his testimony.[68] According to BEEOO, to the extent that he will testify regarding his "factual observations and professional analysis" rendered during the gas detector inspection and data retrieval, "such hybrid fact-opinion testimony should be admitted, despite the lack of expert report."[69] BEEOO alleges that because Sutterlin's opinions were developed at the request of BSEE in its governmental investigation, he should be allowed to testify at trial.[70]

---

[64] *Id.*

[65] *Id.* at 10.

[66] *Id.* at 11.

[67] *Id.*

[68] *Id.* (citing *Beechgrove Redev., LLC v. Carter & Sons Plumbing, Heating & Air-Conditioning, Inc.*, No. 07-8446, 2009 WL 981724, at *6 (E.D. La. Apr. 9, 2009)).

[69] *Id.* at 11–12 (quoting *Beechgrove Redev., LLC*, 2009 WL 981724, at *6).

[70] *Id.* at 12 (citing *Beechgrove Redev., LLC*, 2009 WL 981724, at *7).

BEEOO contends that Sutterlin is qualified to testify about the data pulled from the GIS gas detectors despite GIS's argument that he cannot do so because he is not a software engineer.[71] BEEOO argues that, under GIS's reasoning, doctors could not testify about patients' injuries unless they could explain exactly how an MRI machine works.[72] BEEOO claims that, in his deposition, Sutterlin described how the gas detectors worked, the recommendation for calibration, their range, functionality, and data storage capabilities, and given his unique expertise, he is qualified to testify about the facts surrounding the gas detectors and data extraction.[73] Furthermore, BEEOO argues that Sutterlin understands how gas detectors work and how to read the data extracted from them, and his offered testimony has little or nothing to do with the computer software used to extract the data.[74] Nevertheless, BEEOO contends that Pavetti has also been listed as a non-retained testifying expert should the Court find it necessary to explain the inner workings of the software to the jury.[75]

Next, BEEOO argues that the data extracted from the Orion gas detectors is reliable, and it need not be peer-reviewed or tested in order to be reliable.[76] According to BEEOO, peer-review is one illustrative element of reliability under *Daubert*, but it is not definitive, and especially in this case, in light of the unique circumstances, the software was adequately tested and verified by MSA.[77] BEEOO contends that all parties involved agreed that a slight modification to the Orion

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.* at 13.

[76] *Id.* at 14.

[77] *Id.* (citing *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 151 (1999)).

program was necessary to facilitate data chip extraction, despite GIS's implication that MSA should have instructed BSEE to put its investigation on hold so that they could submit the software to validation in the market, which is not a standard procedure.[78] Furthermore, BEEOO claims, MSA is the global leader in portable gas detection devices, and in that respect has no peer.[79]

BEEOO alleges that MSA carefully verified its modified software by testing it on three other identical Orion gas detectors, and that Pavetii did his own additional verification testing.[80] According to BEEOO, although GIS contends that "because the print-outs look different, they must be incomparable and unreliable," instead, "the inability to compare the data by counsel is precisely the reason Mr. Sutterlin adds value and assistance to this case."[81] Indeed, BEEOO argues, no other company could extract data from an MSA gas detector, and GIS itself relies upon MSA's software to properly calibrate its other Orion gas detectors, further illustrating that even GIS believes that MSA's software is reliable.[82] In addition, BEEOO claims, Mr. Sutterlin is not providing scientific expert opinions, but rather is explaining MSA's testing and inspections of the GIS gas detectors and the data retrieved from them, which he must do because BSEE's notes are not discoverable in this litigation.[83]

Next, BEEOO asserts that Sutterlin's inability to explain a single data entry—the one detected while the gas detectors were allegedly sealed in a box—is insufficient to exclude him or

---

[78] *Id.*

[79] *Id.*

[80] *Id.* at 15.

[81] *Id.*

[82] *Id.*

[83] *Id.* at 15–16.

the data altogether.[84] BEEOO avers that, although GIS suggests that the only possibility for such a reading is an unreliable extraction, GIS ignores the fact that both gas detectors were regularly malfunctioning and acting erratically on the platform.[85] BEEOO contends that although Sutterlin could not explain the phenomenon, his deposition was not a corporate deposition of MSA; therefore he testified only to his own personal knowledge.[86] Therefore, BEEOO argues, Sutterlin's inability to explain one reading out of several thousand does not render the entire data set or his testimony unreliable, and GIS's arguments that one odd reading should render unreliable the rest of the data goes only to the weight of the evidence, and not its admissibility.[87]

BEEOO also alleges that although GIS seeks to taint all of the data by pointing out that certain dates of the data extracted from the 2006 Unit do not show an "event," it makes no such argument about the 2008 Unit.[88] Furthermore, BEEOO avers, there are no "events" or readings in any log for November 15 or 16, 2012, as no explosion could have occurred had the GIS and D&R crew properly used functioning gas detectors.[89] In addition, BEEOO contends, Sutterlin testified that each data chip has a finite memory, and newer data will be saved over older data.[90]

BEEOO claims that GIS's argument that Sutterlin's testimony should be excluded because he cannot cross-corroborate the dates listed on the data logs extracted from the gas detectors is

---

[84] *Id.* at 16.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.* at 17.

[89] *Id.*

[90] *Id.*

similarly a red herring.[91] According to BEEOO, the weight of the evidence suggests that the dates were accurate, and GIS's position is mere speculation.[92] BEEOO asserts that Sutterlin testified that the software used to calibrate the detectors has an option to automatically update the time if incorrect, and both units were calibrated prior to sending them offshore.[93] BEEOO also alleges that the testimony of GIS and D&R crewmembers stating that the gas detectors were being used at the time of the incident is not credible, given their insistence that they saw a "green light" on the unit, indicating a safe reading, despite the fact that these detectors only have red lights.[94]

## C.   *GIS's Arguments in Further Support of Excluding Testimony of Brian Sutterlin*

In reply, GIS asserts that many of the background issues raised by BEEOO are not relevant to the issue of whether Sutterlin should be permitted to testify as a non-retained expert.[95] For example, GIS avers, there will be no testimony from any witness regarding any problems with the two Orion gas detectors while they were on the West Delta 32, and while BEEOO apparently hopes that it can introduce testimony from the BSEE investigators or the results of its investigation, any such testimony would be hearsay and inadmissible.[96] Instead, GIS argues, there will be testimony presented that a gas detector was in use in the area where the incident occurred, and such eyewitness testimony clearly calls into question the MSA data extraction results.[97]

---

[91] *Id.* at 18.

[92] *Id.*

[93] *Id.*

[94] *Id.* at 20.

[95] Rec. Doc. 556 at 2.

[96] *Id.*

[97] *Id.* at 3.

In addition, GIS claims that although BEEOO asserts that the GIS gas detectors were found in the gauger's shack, the evidence log from BEEOO's investigators calls into question the handling of the evidence and the location of the gas detectors.[98] However, GIS avers, such facts are irrelevant to the issue of whether Sutterlin should be able to offer an expert opinion regarding whether the two Orion gas detectors were used on the morning of the incident.[99] GIS urges the Court to exercise close scrutiny over the methodology used by MSA to extract data from the gas detectors in light of the fact that no party to this litigation, except BEEOO's investigators, have had access to, or been able to test, the gas detectors.[100]

GIS argues that, although it received verification data from counsel for MSA, the extracted data does not look like conventionally downloaded data, and there is therefore no way to compare the two sets of data.[101] According to GIS, although BEEOO claims that MSA is "without peer" and thus its software cannot be peer-reviewed, that is simply a self-serving statement, and the software could be reviewed and verified by independent sources.[102] However, GIS contends, that has not occurred, and BEEOO instead asks the Court to simply accept Sutterlin's testimony regarding the accuracy of the extracted data.[103] Finally, GIS notes that BEEOO does not dispute that there are inaccuracies in the data that Sutterlin cannot explain.[104] According to GIS, although

---

[98] *Id.*

[99] *Id.*

[100] *Id.* at 4.

[101] *Id.*

[102] *Id.* at 5.

[103] *Id.*

[104] *Id.*

BEEOO labels such inaccuracies as "red herrings" that can be addressed by cross-examination, Sutterlin will not appear at trial, and therefore his answer will simply be what he stated in his deposition: that such inaccuracies are inexplicable.[105] GIS avers that Sutterlin should not be permitted to testify as an expert in light of his inability to explain the computer program, the inability to verify the data extracted and reconstructed, and his inability to explain flaws in the data.[106]

## III. Law and Analysis

### A. *Legal Standard*

The parties do not dispute that Sutterlin is a non-retained, Rule 26(a)(2)(C) hybrid witness. Federal Rule of Civil Procedure 26(a)(2)(A) requires parties to "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Rule 26 "categorizes these witnesses for purposes of disclosure requirements into those expert witnesses who are retained or specially employed to give expert testimony and those who are not retained or specially employed but may provide expert testimony."[107]

Federal Rule of Civil Procedure 26(a)(2)(B) provides that "this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Prior to 2010, expert witnesses who were not specially retained or employed to provide expert testimony, such as treating physicians,

---

[105] *Id.*

[106] *Id.*

[107] *Rea v. Wis. Coach Lines, Inc.*, No. 12-1252, 2014 WL 4981803, at *2 (E.D. La. Oct. 3, 2014) (Duval, J.) (citing Fed. R. Civ. P. 26(a)(2)(A), (C); Fed. R. Civ. P. 26 2010 advisory committee's notes).

were exempt from disclosure requirements altogether, but were allowed to testify as to those facts related to their actual participation.[108] However, since 2010, Federal Rule of Civil Procedure 26(a)(2)(C) has provided that "[u]nless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state: (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Rule 26(a)(2)(C) was added to "mandate summary disclosures of the opinions to be offered by expert witnesses who are not required to provide reports under Rule 26(a)(2)(B) and of the facts supporting those opinions."[109]

The disclosure rule was aimed at "address[ing] concerns about expert discovery," specifically "resolv[ing] a tension that has sometimes prompted courts to require reports under Rule 26(a)(2)(B) even from witnesses exempted from the report requirement."[110] To the extent that hybrid witnesses testify to "facts unrelated to the expert opinions the witness will present," they are not subject to any disclosure obligation at all.[111] However, to the extent that hybrid witnesses provide expert opinions pursuant to Federal Rules of Evidence 702, 703, or 705, they must provide disclosures pursuant to Rule 26(a)(2)(C).[112] Therefore, even "if the expert testimony

---

[108] *Id.*

[109] Fed. R. Evid. 26(a)(2)(C) 2010 advisory committee's notes.

[110] *Id.*

[111] *See id.*

[112] *Id.*

is properly disclosed, the testimony must also be determined to be admissible under Federal Rules of Evidence Rule 702."[113]

Thus, although *Daubert* and its progeny often discuss specially retained experts, Rule 26(a)(2)(C) experts who provide expert opinions pursuant to Rule 702 may also be challenged under *Daubert*.[114] Although the Fifth Circuit has not opined directly on this issue, it has on numerous occasions considered *Daubert* challenges to non-retained experts without first assessing whether *Daubert*'s requirements concerning qualifications, reliability, or methodology apply to experts who are not specially retained for the purposes of litigation.[115] Furthermore, the Seventh Circuit has recently stated in a persuasive opinion regarding treating physicians, the typical example of a Rule 26(a)(2)(C) expert who is not required to submit an expert report: "Treating physicians are no different than any other expert for purposes of Rule 702; before proffering expert

---

[113] *Rea v. Wis. Coach Lines, Inc.*, No. 12-1252, 2014 WL 4981803, at *3 (E.D. La. Oct. 3, 2014) (Duval, J.). Furthermore, the plain language of Rule 26(a)(2)(C) specifically refers to the requirement that non-retained experts provide summaries of that subject matter to which the witness "is expected to present evidence under Federal Rule of Evidence 702, 703, or 705").

[114] *See, e.g.*, *id.* at *2 (resolving a challenge to a Rule 26(a)(2)(C) expert witness both for failing to provide a sufficient disclosure and under *Daubert*'s reliability prong); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 471 (E.D.N.Y. 2011) (addressing the qualifications and methodology of a non-retained treating physician and concluding that certain physicians must be excluded because they did not perform independent differential diagnoses and therefore their testimony was "not based on scientifically reliable or admissible methodologies"); *Harvey v. Novartis Pharm. Corp.*, 895 F. Supp. 2d 1206, 1213 (N.D. Ala. 2012) (concluding that a non-retained expert was not qualified to opine as to the cause of osteonecrosis of the jaw despite treating the plaintiff for the condition, and that furthermore the expert's opinion was not sufficiently reliable because he failed to perform a proper differential diagnosis during treatment); *Rowland v. Novartis Pharm. Corp.*, 9 F. Supp. 3d 553, 566 (W.D. Pa. 2014) (noting that treating physicians' opinions on prognosis and causation are inherently expert testimony, but that even if such testimony is excluded as unreliable, a physician could still be permitted to testify about his examination of the plaintiff, the tests he conducted, and any diagnosis he reached) (citing *Pease v. Lycoming Engines*, 2012 WL 162551, at *12 (E.D. Pa. Jan. 19, 2012); *Heller v. Shaw Indus.*, 167 F.3d 146, 159 n.8 (3d Cir. 1999)).

[115] *See, e.g.*, *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (concluding that a treating physician's opinion regarding causation was irrelevant under *Daubert* because the doctor's opinion was "perfectly equivocal"); *Seymore v. Penn Mar. Inc.*, 281 F. App'x 300, 301 (5th Cir. 2008) (affirming a district court's decision to admit a treating physician's testimony on the basis that the doctor's testimony was not unreliable under *Daubert*); *Kallassy v. Cirrus Design Corp.*, 265 F. App'x 165, 166 (5th Cir. 2008) (affirming a district court's decision to strike a treating physician's testimony regarding causation on the basis that it was unreliable under *Daubert*).

testimony, they must withstand *Daubert* scrutiny like everyone else."[116] Therefore, the Court's analysis regarding reliability under *Daubert* may differ when assessing a Rule 26(a)(2)(B) expert compared to a Rule 26(a)(2)(C) expert only to the extent that the Court will need to take into account the information that the expert relied upon in coming to his or her conclusion, as a Rule 26(a)(2)(C) expert is confined to testifying only to opinions that arise from his or her "ground-level involvement in the events giving rise to the litigation."[117]

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702.[118] Rule 702, which governs the admissibility of expert witness testimony, provides that an expert witness "qualified . . . by knowledge, skill, experience, training or education," may testify when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."[119] For the testimony to be admissible, Rule 702 establishes the following requirements:

(1) the testimony [must be] based upon sufficient facts or data,

(2) the testimony [must be] the product of reliable principles and methods, and

(3) the witness [must apply] the principles and methods reliably to the facts of the case.[120]

---

[116] *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015).

[117] *Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011). *See also Deutsch*, 768 F. Supp. 2d at 475 (concluding that there was no inconsistency between his own order prohibiting certain non-retained treating physicians from testifying as to causation in a field in which they lacked expertise and other orders permitting such testimony from retained experts who likewise lacked certain expertise, in light of the fact that "[u]nlike non-retained experts, those experts were not limited to patient records and information available at the time of diagnosis and treatment in forming their opinions, and were subject to the Rule 26(a)(2)(B) reporting requirement").

[118] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

[119] Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[120] Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable."[121] The court's gatekeeping function thus involves a two-part inquiry into reliability and relevance. First, the court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.[122] The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid.[123] The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.[124]

In *Daubert*, the Court identified a number of factors that are useful in analyzing reliability of an expert's testimony: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) any evaluation of known rates of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) general acceptance within the scientific community.[125] In *Kumho Tire Co. v. Carmichael*, the Supreme Court emphasized that the test of reliability is "flexible" and that *Daubert*'s list of specific factors does not necessarily nor exclusively apply to every expert in every case.[126] The overarching

---

[121] *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that the court's gatekeeping function applies to all forms of expert testimony).

[122] *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)).

[123] *See Daubert*, 509 U.S. at 589.

[124] *See id.* at 590.

[125] *See id.* at 592–94.

[126] *Kumho Tire*, 526 U.S. at 142; *see also Seatrax*, 200 F.3d at 372 (explaining that reliability is a fact-specific inquiry and application of *Daubert* factors depends on "nature of the issue at hand, the witness's particular expertise

goal "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[127] The court must also determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence—in other words, whether it is relevant.[128]

A court's role as a gatekeeper does not replace the traditional adversary system,[129] and "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[130] As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[131] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[132]

### B.  *Analysis*

At oral argument, counsel for GIS conceded that it is undisputed that Sutterlin is a non-retained, Rule 26(a)(2)(C) hybrid witness, and that the chief criticism of him is whether the methodology he relied upon is reliable. GIS has also asserted that, even if the Court does not bar

---

and the subject of the testimony").

[127] *Kumho Tire*, 526 U.S. at 152.

[128] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[129] *See Daubert*, 509 U.S. at 596.

[130] Fed. R. Evid. 702 advisory committee's note, "2000 Amendments."

[131] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

[132] *Id.* (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

Sutterlin's testimony on the basis of his allegedly flawed methodology, Sutterlin should be limited to testifying as a fact witness regarding his role in performing the data extraction, but be prohibited from offering independent opinions regarding such issues as how a gas detector works, how it is calibrated, and any alleged problems with the gas detector.[133]

## 1.   Rule 26(a)(2)(C)

As a preliminary matter, the Court first addresses GIS's argument that even if Sutterlin's testimony is not excluded on the basis that he relied on an unreliable methodology, he should be limited to testifying only to his activities in connection with BSEE's investigation because he was designated as a Rule 26(a)(2)(C) expert and did not produce an expert report pursuant to Rule 26(a)(2)(B).[134] As a hybrid witness, Sutterlin seeks to testify as "an actor with regard to the occurrences from which the tapestry of the lawsuit was woven."[135] In other words, "his opinion testimony arises not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation."[136]

GIS acknowledges that because he was a hybrid witness, Sutterlin was not required to prepare a formal report, but alleges that his testimony must only encompass facts made known to him during the course of his work for BSEE.[137] In response, BEEOO asserts that Sutterlin does not plan to offer any expert opinions at trial and will only testify about what his team did in

---

[133] Rec. Doc. 511-2 at 17.

[134] Rec. Doc. 511-2 at 16.

[135] *Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011) (quoting *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 113 (1st Cir. 2003)).

[136] *LaShip, LLC v. Hayward Baker, Inc.*, 296 F.R.D. 475, 480 n.34 (E.D. La. 2013) (Brown, J.) (quoting *Downey*, 633 F.3d at 6).

[137] Rec. Doc. 511-2 at 16.

response to the inquiries of BSEE to inspect the GIS gas detectors, extract their data, and inform BSEE of certain facts based upon that data.[138] According to BEEOO, Sutterlin used his expertise to provide testimony about certain facts in this case, but the only opinion testimony he offered was, at most, regarding his confidence in the reliability of the veracity of the data extracted from the gas detectors.[139]

Even where an expert fails to comply with Rule 26's disclosure requirements, courts must exercise their discretion in deciding whether or not to exclude such testimony. In evaluating whether to exclude expert testimony, the Fifth Circuit instructs that courts should consider four factors: (1) the explanation of the party for its failure to identify the witness, (2) the importance of the excluded testimony, (3) the potential prejudice that would arise from allowing the testimony, and (4) the availability of a continuance to cure such prejudice.[140] Here, neither GIS nor BEEOO frames its arguments regarding Sutterlin's testimony according to this four-factor test. Furthermore, the Court cannot evaluate based on the record before it precisely what knowledge Sutterlin used in coming to his conclusions during the BSEE investigation, and what additional expertise he may have offered during his deposition in response to a line of questioning from BEEOO's counsel.

However, even assuming that GIS is correct that Sutterlin's proffered testimony at his deposition was well outside the scope of his participation in the events and should have required an expert report pursuant to Rule 26(a)(2)(B), GIS points to no prejudice that would arise from

---

[138] Rec. Doc. 528 at 2.

[139] *Id.* at 10.

[140] *Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007)

allowing the testimony. Sutterlin was deposed on September 30, 2014, nearly two years before the start of trial, and BEEOO intends to submit only Sutterlin's deposition, rather than live testimony, at trial. Therefore, GIS has had notice, for nearly two years, of every word of Sutterlin's potential testimony, and could have hired an expert to rebut his factual assertions regarding how gas detectors work, how they are calibrated, what a bump test is, and any alleged problems with the gas detector, the topics to which GIS objects.[141] GIS's failure to do so does not warrant exclusion of Sutterlin's testimony at this stage.

### 2. Methodology

Next, the Court considers GIS's argument that Sutterlin used an improper methodology in coming to his conclusion that the gas detectors were not turned on during November 15 or 16, 2012, and therefore his opinion must be excluded as unreliable pursuant to Rule 702. Because it appears that GIS's motion seeks to attack the reliability of a computer program that Sutterlin did not create, the Court faces a unique situation in which it appears that a party is challenging not the methodology of the proffered witness per se, but the methodology relied upon by another non-retained expert, the results of which Sutterlin uses in order to come to his conclusions.

As a preliminary matter, at oral argument, counsel for GIS argued that Sutterlin was not the proper non-retained expert to testify in this case, as he merely oversaw the team that extracted the data and did not perform the data extraction or develop the software used in it. However, Federal Rule of Evidence 703 allows experts to base their opinions on facts or data that the expert has been made aware of or personally observed, which includes the efforts of other experts, provided that "experts in the particular field would reasonably rely on those kinds of facts or data

---

[141] *See* Rec. Doc. 511-2 at 17.

in forming an opinion on the subject." To exclude Sutterlin because he relied on an action taken

by Pavetti, who created the computer program on which Sutterlin relied, in forming his opinion

would undermine the Federal Rules of Evidence's clear understanding that experts often rely on

one another's specialties in order to come to an interdisciplinary conclusion in complex matters.[142]

However, although Rule 703 undoubtedly allows experts to testify on the basis of facts or

data that "need not be admissible" in and of themselves, Rule 703 does not necessarily allow a

witness to rely on the methodology of another expert, if that expert's methodology would be

deemed unreliable under *Daubert*. The parties do not cite, nor could the Court find, any Fifth

Circuit precedent addressing this precise scenario. However, the Court need not resolve the issue

at this stage because GIS has not convinced the Court that there is sufficient evidence that either

Sutterlin or Pavetti's methodology was flawed.

Sutterlin's methodology in coming to his conclusion that the Orion gas detectors were not

turned on, according to his own deposition testimony, consisted of looking at the event records

and periodic data logs recorded by the Orion gas detectors.[143] As GIS itself attests, Sutterlin did

not write the program used to extract data from the two gas detectors, and cannot testify as to its

---

[142] *See* Fed. R. Evid. 703 advisory committee's note, "1972 Proposed Rules" ("[T]he rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays.").

Furthermore, had Pavetti sought to testify regarding the meaning of the data extracted, as Sutterlin does, GIS could attack Pavetti as the incorrect expert to provide an analysis of the data recorded by the gas detectors, as he is a software engineer rather than an electrical engineer trained in assessing recorded data. Federal Rule of Evidence 703 helps to avoid precisely this kind of catch-22. *See, e.g.*, *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 322 (E.D.N.Y. 2013) (rejecting arguments that an expert lacked the necessary specialization regarding each topic on which he planned to testify by noting that Rule 703 allows experts to rely on data collected by others) (citing *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000)).

[143] *See* Dep. of Brian Sutterlin, Rec. Doc. 521 at 43:16–18.

26

specifics.[144] Therefore, GIS's assertions that Sutterlin is not qualified to testify because he is not a software engineer are without merit; Sutterlin explicitly declined to offer opinions regarding the creation of the software, and instead testified as to his own understanding of the data ultimately extracted, based on his presumably acceptable methodology of reviewing the extracted data and coming to a conclusion about its meaning.

Nevertheless, according to GIS, Pavetti committed some error in writing code or in formulating the software program, leading to data that "is so flawed that it cannot meet any reliability standard."[145] As BEEOO points out, although GIS highlights several examples of allegedly inexplicable data, such as recordings made at a time that the gas detectors were stored in sealed boxes and inconsistencies between the event and data logs,[146] GIS points to no evidence to suggest that the questionable data was caused by an improper extraction method, as opposed to an improper recording of data or some other explanation. Furthermore, GIS presents no evidence to contradict Sutterlin's testimony that, as a matter of fact during the BSEE investigation, the modified software was validated by testing it alongside a conventional extraction method on three other Orion machines that were in MSA's possession.[147] Sutterlin testified that the data retrieved through conventional methods was similar to the data extracted by the software.[148] GIS presents argument, but no evidence, to counter the evidence BEEOO has submitted regarding the reliability of the computer program designed by Pavetti. Moreover, GIS participated in Sutterlin's

---

[144] *See* Rec. Doc. 511-2 at 8 (citing Dep. of Brian Sutterlin, Rec. Doc. 521 at 71:25–75:22).

[145] Rec. Doc. 511-2 at 12.

[146] *See id.* at 12–15.

[147] *See* Dep. of Brian Sutterlin, Rec. Doc. 521 at 33:17–24.

[148] *Id.*

deposition on September 30, 2014, and could have in the interim engaged an expert to challenge Pavetti's work or chosen to depose Pavetti himself. It appears they did neither.

Therefore, the Court is not convinced that GIS has pointed to a methodological flaw in Pavetti's computer program that would require the exclusion of any expert testimony that relied upon it. Rejection of expert testimony is the exception rather than the rule,[149] and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[150] The Court notes GIS's objection that cross-examination of Sutterlin will not be fruitful because BEEOO will seek to present his testimony to the jury by deposition rather than through live testimony at trial. GIS had other options to challenge the methodology used by Pavetti in the event its motion to have Sutterlin stricken as an expert failed. Moreover, because GIS had the opportunity to cross-examine Sutterlin at his deposition, and can present the results of that cross-examination to the jury by deposition, the Court declines to exclude Sutterlin's testimony on the basis that he will not testify live at trial.

---

[149] Fed. R. Evid. 702 advisory committee's note, "2000 Amendments."

[150] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

## IV. Conclusion

For the reasons stated above,

**IT IS HEREBY ORDERED** that GIS's "Motion to Exclude Testimony of Brian Sut[t]erlin"[151] and Tajonera and Corporal Plaintiffs' "Motion to Exclude Testimony of Brian Sut[t]erlin,"[152] are **DENIED**.

**NEW ORLEANS, LOUISIANA**, this ___7th___ day of June, 2016.

_Nannette Jolivette Brown_
**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[151] Rec. Doc. 511.

[152] Rec. Doc. 514.

29